539 A.2d 247

**Edwin Frank HALE**

v.

**Sheila Fern HALE.**

**No. 924, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

April 6, 1988.

Certiorari Denied June 27, 1988.

556

558

Paul Mark Sandler (Freishtat and Sandler, on the brief), Baltimore, for appellant.

Shale D. Stiller and Peter F. Axelrad (William L. Reynolds, Alan J. Hoff and Frank, Bernstein, Conaway & Goldman, on the brief), Baltimore, for appellee.

Argued before MOYLAN, WEANT and ROSALYN
B. BELL, JJ.

WEANT, Judge.

Edwin and Sheila Hale were married in 1966. At the
time, they had very little property. They separated briefly
in 1975, but resumed the marriage. In May, 1983, Mrs.
Hale discovered that her husband was having an affair. He
took her to Loch Raven Reservoir and told her he desired a
legal separation. She indicated that she did not want the
marriage to dissolve. Nevertheless, she agreed to the
separation. The couple agreed to have Henry Belsky draw
up a separation agreement. Belsky had been the family
attorney and friend to the Hales for several years. He also
represented Mr. Hale's substantial business interests. On
May 20, Mrs. Hale went to London on a long-awaited
garden club trip. Upon her return, she met with Belsky to
discuss the agreement on June 1. On June 2, both Mr. and
Mrs. Hale met with Belsky to discuss the agreement. On
June 3 the agreement was signed. Among other things, the
agreement provided Mrs. Hale the use of a car owned by
her husband's primary business interest, Port East Trans-
fer, Inc. (Port East). In October of 1983, the car, a Mer-
cedes, needed substantial repairs. The Hales agreed that it
was not worth fixing. Mrs. Hale asked that it be replaced
by a new Mercedes. Mr. Hale declined, but agreed to have
Port East buy a $17,000 Toyota for her use. Belsky pre-
pared a letter-agreement to effectuate the substitution of
the Toyota for the Mercedes. He had Mrs. Hale sign the
agreement, which also stated that the parties were "ratify-
ing and affirming all of the other provisions" of the separa-
tion agreement.

During the fall of 1983, Mrs. Hale received benefits under
the contract. Although separated from her husband, she
testified that she still had hopes of reconciliation. These
hopes disappeared when Mr. Hale asked her if he could
borrow her luggage to take his girlfriend on a trip to
Mexico.

Shortly after that, one of Mrs. Hale's friends convinced her to meet with another attorney. After receiving independent counsel, Mrs. Hale promptly sought rescission of the separation agreement and offered to return the parties to their original positions. Mr. Hale resisted rescission. Mrs. Hale then filed the present action against her husband in the Circuit Court for Baltimore County seeking rescission of the contract and damages for fraud and negligent misrepresentation. (In *Hale v. Hale,* 66 Md.App. 228, 503 A.2d 271, *cert. denied,* 306 Md. 118, 507 A.2d 631 (1986), we held that Mrs. Hale could maintain this action separately from a divorce action.) The case was tried before the court without a jury. The trial court ordered the agreement rescinded. The court also found the existence of fraud, but declined to award compensatory or punitive damages. The court dismissed Mrs. Hale's claim for damages based on negligent misrepresentation because it had found that there was fraud. Finally, the court declined to award Mrs. Hale attorneys' fees.

Mr. Hale appeals the trial court's decision to rescind the separation agreement. Mrs. Hale cross-appeals the court's refusal to award her damages and attorney's fees.

## *Mr. Hale's Appeal*

The trial court rescinded the separation agreement for several reasons, which were stated in an oral opinion.

The first ground for rescission was that the agreement was unconscionable. This finding was based on the distribution of the parties' assets provided in the agreement. The court found as a fact that immediately prior to the agreement, Mr. Hale had assets worth $4.99 million while Mrs. Hale's assets totaled $215,000. Mr. Hale's annual salary was approximately $300,000. Mrs. Hale, as secretary/treasurer of Port East, received a salary of $10,400 per year. The judge determined the value of the assets passing to Mrs. Hale under the agreement to be $142,500. The judge felt that this, being roughly four percent of Mr. Hale's assets, was unconscionable.

He then determined that alimony of $40,200 per year provided by the agreement did not alter that conclusion. He noted that Mrs. Hale was forfeiting her salary at Port East ($10,400), which had essentially been an allowance because Mrs. Hale's only duties were to sign papers, which were often brought to the Hales' house for her to sign. Thus, her net income increase under the agreement was only $29,800 per year. Given Mr. Hale's salary of $300,000, the trial court viewed the alimony provision as insignificant.

In reaching its conclusions about the value of the agreement's benefits for Mrs. Hale, the court gave little weight to benefits which would be enjoyed by Mrs. Hale in the future because of the following provision in the agreement:

This agreement has been prepared to reflect the current financial situation and other circumstances of the parties. In the event that Husband's financial situation shall alter adversely and the parties are unable to agree to a modification of the terms of this and subsequent agreements, the terms of this Agreement and subsequent agreements shall be subject to modification and order of the Court.

(Belsky did not insert any provisions for modification in the agreement in the event that Mr. Hale's financial situation improved or Mrs. Hale's deteriorated.) Mr. Hale contended that his net worth at the time of the agreement was roughly $2,000,000, rather than $5,000,000. He also placed a value of $770,000 on the benefits accruing to his wife under the agreement.

The second reason offered by the trial court for rescinding the agreement was that Mr. Hale obtained the agreement by abusing a confidential relationship between himself and Mrs. Hale. Because of this, Mr. Hale had the burden of proving that the terms of the agreement were fair. He failed to meet this burden.

The court's third reason for rescinding the agreement was fraud. The court found that Mr. Hale knew Mrs. Hale's primary desire was reconciliation. Mr. Hale then

told her that he would not consider reconciliation until the agreement was signed. But, the court found, Mr. Hale really had no intention of seriously considering reconciliation.

The fourth reason advanced by the court for rescission was duress. The court did not elaborate on this finding, although it noted that, during the months of May and June of 1983, Mrs. Hale was suffering from emotional problems, having trouble eating and sleeping, and had an ulcer.

The final ground for rescission relied on by the court was that Mr. Hale and Mr. Belsky exercised undue influence over Mrs. Hale, causing her to sign an agreement she really did not understand.

Mr. Hale argued that even if the agreement was rescindable when signed, Mrs. Hale was estopped from doing so by subsequent ratification. He urged two theories of ratification: Mrs. Hale's acceptance of benefits under the agreement and the letter-agreement substituting the Toyota for the Mercedes, which expressly ratified the initial agreement. The trial court rejected both theories.

Mr. Hale presents three issues on appeal (which we have renumbered):

1. Whether the Court's determination that Mr. Hale breached a confidential relationship with his wife and that the Agreement was a product of fraud was insufficient in law and clearly erroneous when Mrs. Hale participated in developing aspects of the Agreement and decided to sign the Agreement in the hope of reconciling with her husband.

2. Whether the Court's determination that the Separation Agreement was unconscionable was insufficient in law and clearly erroneous when Mrs. Hale received the following: $42,000.00 [*sic*, $40,200] in alimony per year; a guaranteed minimum of $300,000.00 from the sale of the family home; life insurance on the life of Mr. Hale in the amount of $500,000.00; and other significant benefits for herself and the parties' son.

3. Whether the Court's determination that Mrs. Hale did not ratify the Separation Agreement when she signed an Addendum to the Agreement for additional benefits five months later, was insufficient in law and clearly erroneous.

### 1. and 2.

We will consider Mr. Hale's first two arguments together. He argues that all of the reasons offered by the trial court for rescinding the agreement are insufficient as a matter of law and that they are based on clearly erroneous findings of fact. (Although his first question presented does not specifically mention duress or undue influence, the corresponding argument in his brief does challenge those findings.) For the reasons that follow, we hold that the grounds relied on by the court were legally sufficient to justify rescission and that they are supported by the evidence.

### Confidential Relationship

"[T]he question of whether a confidential relationship exists between husband and wife [is] a question of fact. Among the various factors to be considered in determining whether a confidential relationship exists are the age, mental condition, education, business experience, state of health, and degree of dependence of the spouse in question." *Bell v. Bell*, 38 Md.App. 10, 14, 379 A.2d 419 (1977), *cert. denied*, 282 Md. 729 (1978). The trial court found that Mr. Hale was the dominant party in a confidential relationship with his wife. In reviewing this, as well as the trial court's other findings, "we must first assume the truth of all the evidence and of all the favorable inferences fairly deducible therefrom tending to support the factual conclusions reached by the [trial judge]." *McClellan v. McClellan*, 52 Md.App. 525, 530, 451 A.2d 334 (1982), *cert. denied*, 295 Md. 283 (1983) (citations omitted). Md. Rule 1086.

The trial court's oral opinion does not mention the ages of the parties. It notes that, although Mrs. Hale had one year of community college education, her business experience

was very limited. Her role as bookkeeper for Port East was ministerial. As secretary/treasurer, she merely signed whatever papers her husband told her to sign. For a short period at the inception of Port East, she attempted to run the business while her husband continued in his regular job at another firm. She was so overwhelmed by the responsibility that she moved out of the home for two weeks. Mr. Hale recognized her inability to run the company and hired someone else to do it.

From that point on, Mrs. Hale had no part in the management of Port East. She managed the household, but did so with the budget her husband provided her. In fact, prior to the 1983 separation, she never even had her own bank account. She had signed some of Mr. Hale's notes as a guarantor. She did so, not based on her own business judgment, but because Mr. Hale had told her to. The court found that Mrs. Hale was generally aware of her husband's wealth and property—she knew that they lived well—but found that she was not sufficiently informed for the purpose of making the "ultimate decision" to sign the agreement.

The court also found that she was not well physically at the time the agreement was promulgated. The revelation of her husband's infidelity and the separation had caused her great emotional distress. She had difficulty eating and sleeping and developed an ulcer.

█ Finally, the court concluded that she did, in fact, repose trust in her husband, as she always had, to take care of her and Ed, Jr., the Hales' only child. The court felt that Mr. Hale was aware of her trust in him, that he intended for her to trust him, and that he used this trust to "extract" the agreement from her. Because these findings are supported by Mrs. Hale's testimony, as well as other credible evidence, we cannot conclude that they are clearly erroneous.

█ Mr. Hale contends that it could not be reasonable for his wife to repose trust in him "in the inherently adverse

context of separation negotiations." In order for Mrs. Hale to establish a confidential relationship, she "must prove that she justifiably assumed that her husband would only act in a manner consistent with [her] welfare." *McClellan, supra,* 52 Md.App. at 531, 451 A.2d 334. Here, the trial court noted that throughout May and June of 1983, the Hales continued having sexual relations. In fact, they had sexual relations only an hour before signing the agreement. Mrs. Hale also testified that her husband told her the reason he needed to separate from her was that he felt guilt because of his numerous extramarital affairs. When he informed her of his desire for a separation at Loch Raven Reservoir, he told her that he would take care of her and Ed, Jr. Under these circumstances, we cannot say that the trial court was clearly erroneous in concluding that Mrs. Hale's reliance on her husband was justified. The evidence does not paint a picture, in early June of 1983, of the typical adversarial marital break-up.

■ Mr. Hale also contends that Mrs. Hale played an active role in negotiating the agreement and that her independent, "even distrustful" participation in framing the agreement is inconsistent with the finding of a confidential relationship. He relies on *McClellan, supra,* for this proposition. But in *McClellan,* the trial court had found that the wife, who alleged the confidential relationship, had participated in negotiations, had understood the agreement, and had not been subservient to her husband's will. *Id.* at 531–32, 451 A.2d 334. In the case at bar, the trial court concluded that Mrs. Hale's participation in forming the agreement was minimal. While she did make a few suggestions, most of her input resulted from suggestions made to her by Henry Belsky, whom she thought was acting as her attorney. Further, the court found that she did not understand the agreement. As late as June 1, she did not comprehend that it was a final agreement. The court found that her meetings with Belsky were short. And the court specifically rejected Belsky's testimony that he had discussed the agreement line by line with her prior to having

her sign it. (The agreement was 15 pages and the signing meeting lasted only 30–45 minutes.) Again, throughout the marriage, Mrs. Hale had been subservient to the will of Mr. Hale. These findings are supported by the evidence and distinguish the case from *McClellan.*

■ Once the existence of a confidential relationship is established, the dominant party has the burden of proving that the agreement is fair in all respects. *Blum v. Blum,* 59 Md.App. 584, 595, 477 A.2d 289 (1984). The trial court did not merely find that Mr. Hale failed to meet his burden of proof as the dominant party: it found that the agreement was unconscionable.

■ Mr. Hale contends that the trial court's findings regarding his net worth and the value of his wife's benefits under the contract are clearly erroneous. Mr. Hale argues that his net worth in June of 1983 was just under $2,000,-000. The trial court found it to be just under $5,000,000. Mr. Hale's three principal assets are Port East, a real estate interest at Pulaski Highway, and a real estate interest at Clinton Street. He contends that the appropriate value of Port East in June of 1983 was $1,329,700. Mr. Hale's business appraiser, Gunther Boris, testified that he reached this figure by multiplying the adjusted book value—$1,294,-728—by 1.58 and discounting the product by 35%. Boris testified that 1.58 was the appropriate multiplier to use for a trucking company like Port East and that the 35% discount was primarily to account for the fact that Port East was not a publicly held corporation. In preparing financial statements to obtain bank loans, however, Mr. Hale had used a book value multiplier of 3.0 to determine the fair market value of Port East. He testified that industry practice was to use a multiplier of 6.0, but that he used 3.0 because Port East was not publicly owned. Boris and Mr. Hale's accountant both testified that a multiplier of 3.0 was too high. The owner of property is presumed to be familiar with its value so that his opinion of its value is admissible as evidence. *Cofflin v. State,* 230 Md. 139, 142–43, 186

A.2d 216 (1962). Even though Mr. Hale contended at trial that his recent valuations were based on a multiplier that was too high, as the owner of Port East, those valuations were competent evidence of its value.

We cannot say that the trial judge was clearly erroneous in choosing the multiplier Mr. Hale used over that of his expert witnesses at trial. The court thus could have multiplied book value of Port East by 3.0 and applied a discount of less than 35%, since Mr. Hale's multiplier of 3.0 had already been adjusted to reflect the fact Port East was not publicly owned. Therefore, the court's value of $2,900,000 for Port East was not clearly erroneous.

Mr. Hale's real estate appraiser testified that the Pulaski Highway property had a value (net of mortgage) of $435,-200 and that the Clinton Street property had a value (net of mortgage) of $397,500. Mrs. Hale's expert testified that the net values were $1,100,000 and $718,000 respectively. The court accepted Mrs. Hale's expert's values and we cannot say that this was clearly erroneous.

■ With these values for Mr. Hale's principal assets, we must accept the trial court's assessment of his net worth of nearly $5,000,000. Mr. Hale contends that the true value of the agreement to Mrs. Hale was $770,000. Even if we were to accept this, it could not be said that he had met his burden of proving that the agreement was fair in all respects. Mrs. Hale's rights under the Marital Property Act were worth substantially more than $770,000. Md. Fam.Law Code Ann. § 8–201, *et seq.* (1984 and 1984, 1987 Cum.Supp.) (Marital Property Act). (In 1983, this was Md.Cts. & Jud.Proc.Code Ann. § 3–6A–01, *et seq.* (1980 Repl.Vol. and 1980 Repl.Vol., 1983 Cum.Supp.).)

We conclude that the trial court properly applied the factors set out in *Bell v. Bell, supra,* 38 Md.App. 10, 379 A.2d 419, and that its findings are supported by credible evidence.

We will briefly address the other grounds relied upon by the trial court in rescinding the separation agreement.

*Fraud*

 The trial court found that Mr. Hale told Mrs. Hale that he was interested in discussing reconciliation, but would only do so after the agreement was signed. The court found, as a fact, that Mr. Hale was aware of Maryland's Marital Property Act and wanted to protect his property with the agreement. He used sexual relations to make his wife believe that he was interested in reconciliation when, the court found, he had no intentions of reconciling. Ray Turchi, a former Port East employee, testified that he heard Mr. Hale admit to this strategy during May and June of 1983. Mr. Hale points out on appeal that Turchi has since had a bitter falling out with Port East. But the trial court, in its opinion, indicated that it accepted Mr. Turchi's testimony. Assessing the credibility of witnesses is the role of the trial court, not the appellate courts. *Eckstein v. Eckstein,* 38 Md.App. 506, 516, 379 A.2d 757 (1978). We cannot say the court's factual findings with regard to fraud are clearly erroneous. Md. Rule 1086.

Mr. Hale contends that a person signing a separation agreement cannot reasonably rely on hopes of reconciliation. But the trial court found that it was the design of Mr. Hale to use reconciliation to lure his wife into signing away her rights under the Marital Property Act. Mrs. Hale testified that she believed Mr. Hale would consider reconciliation until he asked to borrow her luggage for his girlfriend to use on a trip with him. (Obviously, his "unkindest cut of all.") Given the circumstances surrounding the relationship of the Hales and Mrs. Hale's weakened physical and emotional state, we cannot say that the trial court was clearly erroneous in finding Mrs. Hale's reliance to be reasonable.

*Undue Influence*

The trial court's findings with regard to Mr. Hale's conduct go beyond undue influence, albeit the court did find that Henry Belsky influenced Mrs. Hale to her detriment.

Contrary to Mrs. Hale's assertions on appeal, the trial court did not find that Belsky deliberately collaborated with Mr. Hale to mislead her. The court, nevertheless, found that Mrs. Hale did believe that Belsky was acting as *her attorney* and that he recognized this. Belsky did recommend to Mrs. Hale that she seek independent counsel and told her that she had certain marital property rights that would be forfeited by the agreement. These efforts, however, were couched in terms which the trial court found were not strong enough, under the circumstances, to convince Mrs. Hale to seek independent advice. Belsky's attempted warnings were insufficient to overcome her trust in him and her belief that he would not allow her interests to be adversely affected. These findings are supported by Mrs. Hale's testimony, as well as other credible evidence, and are not clearly erroneous.

Mr. Belsky allowed himself to be used by Mr. Hale to influence Mrs. Hale. The trial court found that Mr. Hale intended so to use Belsky and Ray Turchi's testimony supports that finding. Belsky had been the lawyer for the Hales for several years and had even represented Mrs. Hale's parents on occasion. Belsky was also a social friend of the Hales. He realized that Mrs. Hale reposed trust in him. He did not want to help Mr. Hale extract the agreement from Mrs. Hale, but allowed himself to be so used out of fear of losing Mr. Hale's substantial legal business.

It is interesting to note that Mrs. Hale came to Belsky in 1975 when she temporarily left her husband. At that time, Port East was just beginning to operate and had not achieved the tremendous success it would later achieve. Belsky then told Mrs. Hale that he could not represent her against her husband and gave her the names of three other attorneys to consult. But in 1983, even though he knew she would sign an agreement if he drafted it, he presented her with a disadvantageous agreement. Belsky could hardly be termed a "neutral scribe" under these circumstances. The trial court's conclusion that the agreement resulted from his undue influence over Mrs. Hale is not clearly erroneous.

 Mr. Belsky's conduct was in violation of Md. Code of Professional Responsibility, DR 5–105. (That rule is now Rule 1.7 of the Rules of Professional Conduct.) DR 5–105, in effect in 1983, prohibited an attorney from accepting or continuing employment of multiple clients unless it was *obvious* that he could adequately represent the interests of each. We feel that when a husband and wife are contemplating a separation agreement, it should be obvious to an attorney that he *cannot* adequately represent the interests of both parties. *See Blum v. Blum, supra,* 59 Md.App. at 598–601, 477 A.2d 289 (dual representation of husband and wife "leaves the door ajar" for attempt to rescind a separation agreement, *id.* at 601, 477 A.2d 289). The Court of Appeals recognized this as long ago as 1967: *Faller v. Faller,* 247 Md. 631, 634, n. 1, 233 A.2d 807 (1967).

### Duress

The trial court did not elaborate on its finding of duress. There was evidence that Mr. Hale told Mrs. Hale that, if she did not sign the agreement, or if she obtained independent counsel, he would hire another attorney and put her through a "terrible fight." Because the trial court's findings with respect to abuse of a confidential relationship, fraud, and undue influence are supported by the evidence, we need not determine whether Mr. Hale's alleged threat would constitute a wrongful threat in order to support a finding of duress. *But see, Eckstein, supra,* 38 Md.App. at 514–15, 379 A.2d 757.

### Unconscionability

 As we indicated earlier, the trial court's findings with regard to Mr. Hale's net worth at the time of the agreement are supported by the evidence. In light of our holdings with regard to abuse of a confidential relationship, fraud, and undue influence, we need not consider whether the trial court erred in valuing Mrs. Hale's benefits under the contract. We note that the trial court found the agreement unconscionable on its face. Even if the court did

undervalue Mrs. Hale's benefits under the agreement, however, the agreement could still be found to be unconscionable where it is surrounded by inequitable incidents such as those found in this case. *See Williams v. Williams,* 306 Md. 332, 340, 508 A.2d 985 (1986).

*3.*

Mr. Hale contends that, even if sufficient grounds for rescission existed at the time of execution of the agreement, Mrs. Hale ratified it subsequently and therefore cannot rescind it. He offers two theories of ratification to support this claim: First, Mrs. Hale accepted benefits after the grounds for rescission ceased to exist. Second, Mrs. Hale expressly ratified the agreement by signing the automobile substitute addendum. (As Mr. Hale's question is presented it does not state the first theory as an issue, but that agrument is broached in his brief.) The trial court rejected both theories of ratification.

■■■ Where grounds for rescission exist, a party will not be deemed to have ratified the contract by acceptance of its benefits until he is, or should be, aware of the grounds for rescission. *See Blum, supra,* 59 Md.App. at 594, 477 A.2d 289. Mr. Hale points out that, soon after the Hales separated, he told his wife to begin dating other people as he was doing. He contends that at this point, Mrs. Hale should have been aware that he had no intention of reconciling with her. Therefore, it would be unreasonable for her to continue to believe that he was acting in her best interests, so any confidential relationship no longer existed. Further, he argues that this should have made his wife aware of any fraud.

The trial court's opinion expressly found that Mr. Hale told his wife to date others, and that he was doing so shortly after the parties separated. Notwithstanding, the court felt that Mrs. Hale's acceptance of benefits thereafter did not amount to a ratification of the agreement. The court found that the Hales continued to have sexual rela-

tions during the period in question. Mrs. Hale's physical and emotional health during the period continued to be poor. (This finding is supported by the testimony of her friend, Barbara Leand.) Mrs. Hale testified that she did not realize her husband had no intentions of seriously considering reconciliation until the end of November of 1985 when he made the heedless request to borrow her luggage for his girlfriend's use. At that time, she sought independent counsel for the first time. Shortly after doing that, she proposed to return the parties to their initial pre-agreement status and sought rescission.

From this evidence, it can logically be inferred that, until the end of November, 1983, Mrs. Hale continued to be the dominated party in a confidential relationship with her husband despite their separation. (This evidence must be viewed in the context of all of the evidence, which, as previously indicated, supports the finding that a confidential relationship existed at the time the agreement was executed.) It can further be inferred that Mrs. Hale was unaware of the fraud perpetrated upon her until that time. Her husband's suggestion that they each date others is not necessarily inconsistent with Mrs. Hale's belief that he would seriously *consider* reconciliation, which is what he told her he would do if she signed the agreement. Where ratification is at issue and more than one inference can be drawn from the facts, the issue becomes a question of fact, "or, as sometimes stated, a mixed question of law and fact." 17A C.J.S. *Contracts* § 614a (1963). We cannot say that the trial court's conclusions are clearly erroneous. Md. Rule 1086.

When the Hales decided to substitute the new Toyota for the Mercedes provided for Mrs. Hale's use in the initial agreement, they signed an addendum in the form of a letter-agreement. The addendum stated that the parties were affirming the agreement. It was signed by Mrs. Hale on 9 November 1983. The trial court found that it did not amount to a ratification. This finding is supported by the evidence which allows the inference that Mrs. Hale was still

dominated by Mr. Hale at that time and that she was unaware of the fraud which induced her to sign the initial agreement. We also note that Mr. Belsky discussed the addendum with her. Had he been acting as her attorney, as she reasonably believed he was, he would not have counseled her to expressly affirm the initial agreement.

 Mr. Hale makes much of the fact that Mrs. Hale requested that the addendum provide her the option of having title to the car transferred to her. He also points to her testimony that she understood the addendum when she signed it. The trial court was not convinced that this evidence showed that she was no longer dominated by her husband, that she was aware of his fraud, or that she was no longer unduly influenced by Henry Belsky. We cannot say that the trial court was clearly erroneous. Md. Rule 1086.

For these reasons, we conclude that the trial court's decision to rescind the separation agreement must be affirmed.

## Mrs. Hale's Appeal

The trial court found in favor of Mrs. Hale on the fraud count of her complaint but denied compensatory and punitive damages. The court also denied her request for attorney's fees. On appeal she asks:

> When an unconscionable agreement, prepared by an attorney purporting to represent both sides, was procured by fraud, duress, and an abuse of a confidential relationship, should a Court, in addition to rescinding the agreement, also award compensatory and punitive damages, as well as attorneys' fees?

## Compensatory Damages

The trial court declined to award compensatory damages to Mrs. Hale because it felt that rescission of the agreement was sufficient to make her whole. Mr. Hale stipulated at trial that his financial condition had not worsened since

1983. Mrs. Hale filed for divorce on 17 February 1987. Therefore, the marital property subject to her claim upon divorce will be no less than it would have been had the agreement not prevented her from making her claim in 1983.

Mrs. Hale argues on appeal that any awards she receives for alimony and marital property in the future will not compensate her for alimony *pendente lite* and for use of her share of the marital property which she would have been entitled to from June of 1983 to the present absent the agreement. She contends that, without the agreement, she would have received up to half of the marital property through a divorce action or a more equitable separation agreement.

Under the circumstances of this case, we agree with the trial court. In her divorce action, Mrs. Hale likely will be entitled to a share of the marital property. This will be determined in accordance with § 8–205 of the Marital Property Act. Subsection (a)(3) of that section requires the court to consider the economic circumstances of the parties in determining its award. The economic circumstances of Mr. and Mrs. Hale will reflect the effects of the agreement's operation from 1983 to 1987.

Mrs. Hale argues that the prospect of monetary awards in her divorce proceeding are speculative. Be that as it may, the total amount of money she would have received in alimony *pendente lite* and in a property settlement absent the agreement is also speculative. (Given the portrait of Mr. Hale painted by his wife on appeal, we wonder whether there would have even been a separation or divorce if Mr. Hale could not have extracted such an advantageous agreement from Mrs. Hale.) What Mrs. Hale was deprived of was her right to seek alimony and a property award from a court of equity. The rescission granted by the trial court now affords her that opportunity. If the delay has harmed her (and benefited her husband) economically, that should be reflected in the court's award because of § 8–205(a)(3) of

the Marital Property Act just mentioned. We decline to speculate that Mrs. Hale would have been treated any more favorably by a court of equity in 1983 than she will in 1988. In fact, given the facts of this case, she may even be treated more favorably now. *See* § 8–205(a)(10) of the Marital Property Act.

## Punitive Damages

 Mrs. Hale contends that the trial court refused to award punitive damages because it felt that it lacked the authority to do so. We disagree. The court noted that fraud was not the sole factor contributing to the inequitable separation agreement. The court concluded that punitive damages were not appropriate. We do not read the court's opinion to state that it lacked the authority to award punitive damages. We read it as stating that the court, in the exercise of its judgment, did not feel that punitive damages *should* be awarded. We decline to second guess that judgment.

## Attorney's Fees

 Mrs. Hale contends that the trial court erred in deciding that it lacked authority to award attorney's fees. We need not decide this issue. The trial court held, in the alternative, that if it had such authority it would decline to award attorney's fees in the exercise of its discretion. The court felt that the matter could be more appropriately determined in the Hales' divorce action. We cannot say that this was an abuse of discretion. Mrs. Hale's attorney's fees will certainly be reflected in her economic conditions which the court will consider in making a marital property award. The court might also consider the costs of this litigation to Mrs. Hale under § 8–205(a)(10) of the Marital Property Act.

Because we affirm the trial court's refusal to award damages, we need not determine from what source any damages should be paid.

In passing, we feel obligated to point out that this litigation is a classic example of the dangers faced by an attorney when he attempts to represent both parties in a domestic dispute. In our view, this case makes it clear that an individual attorney would do well to recognize the admonitions of *Blum, supra*, as a *verbum sapienti*[1] and avoid attempting the representation of both the husband and the wife in divorce actions.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.