*Shih Ping Li v. Tzu Lee*, No. 50, September Term, 2013.

**FAMILY LAW – MARITAL SETTLEMENT AGREEMENTS – LACK OF INFORMED CONSENT – VOIDABILITY –** Court of Appeals held that marital settlement agreements were not voidable by a self-represented husband who did not give informed consent, confirmed in writing, to an attorney's adverse representation of his wife in connection with the drafting of the agreements, in assumed violation of that attorney's obligations under Rule 1.7 and 1.9 of the Maryland Lawyers' Rules of Professional Conduct, where the husband was a sophisticated party who obtained advice of counsel in connection with a similar agreement with a prior spouse, the agreements at issue contained provisions apprising husband of his right and opportunity to obtain the advice of independent counsel before execution, and the record revealed no clear example of the adverse use of any of husband's assertedly confidential information.

Circuit Court for Montgomery County
Case No. 80154FL
Argued: 10 January 2014

IN THE COURT OF APPEALS OF
MARYLAND

No. 50

September Term, 2013

SHIH PING LI

v.

TZU LEE

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Cathell, Dale R. (Retired,
          Specially Assigned),

JJ.

Opinion by Harrell, J.

Filed: February 21, 2014

In what was described by the trial court judge who heard Husband's Motion to Set Aside Marital Settlement Agreements as "a case of buyer's remorse," Petitioner Shih Ping Li ("Husband") asks us to hold that two marital settlement agreements, executed by him and Tzu Lee ("Wife") in 2005 and 2008, are voidable at his demand. Husband grounds his demand before us on the contention that an attorney, Yu Gu ("Gu"), who assisted the couple earlier in obtaining permanent resident status for Wife in the United States and subsequently served largely as scrivener as to the settlement agreements negotiated between Husband and Wife, violated Rule 1.7, or, in the alternative, Rule 1.9, of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), by failing to obtain Husband's informed consent, confirmed in writing, to her representation of Wife in connection with the two marital settlement agreements. We hold that, on this record, even assuming (without deciding) that a violation of either MLRPC 1.7 or 1.9 occurred, sufficient grounds to render the agreements voidable are not present.

## FACTS

On 12 June 2003, Husband and Wife married, after rekindling a romantic relationship from years past and divorcing their respective prior spouses. We describe below the facts pertinent to this appeal stemming from Husband's and Wife's relationship and eventual separation and divorce.

### I.     The 2003 Immigration Proceeding

In 2001, Husband entered into a Voluntary Separation and Property Settlement Agreement with his first wife, Ms. Mak. Husband retained counsel to assist him in the negotiation and execution of that agreement. Thereafter, he elected to proceed, without

counsel, in filing a Complaint for Divorce from Ms. Mak and representing himself at the resulting uncontested divorce proceedings in 2002.

One year later, just prior to the marriage of Husband and Wife, the couple sought to obtain permanent resident status in the United States for Wife, a Canadian citizen. Wife identified Gu to assist in that process. On 13 June 2003, the day after their marriage, Husband and Wife signed a Notice of Entry of Appearance as Attorney or Representative naming Gu to file what became the 2003 immigration case.

On 3 July 2003, Gu filed with the federal government several forms on behalf of the couple,[1] including a Form I-485 Application to Register Permanent Resident or Adjust Status ("Form I-485 Application"), on which Wife was listed as the Applicant, and Form I-130 Petition for Alien Relative ("Form I-130 Petition"), on which Husband was listed as the Petitioner. Gu also filed a Form I-864 Affidavit of Support ("Form I-864 Affidavit"), in support of the Form I-130 Petition, which supplied details of Husband's ability to support financially Wife. Wife provided Gu with the necessary information and documentation to complete the Form I-864 Affidavit, which included copies of Husband's 2000-2002 tax returns, his three most recent payroll statements, and

---

[1] The record is unclear regarding the identity of the federal government agency that received initially the documents filed by Gu. Husband's and Wife's briefs state that the documents were filed with the United States Department of Justice ("DOJ"), and the Form I-130 Petition that was admitted into evidence in the present case bears DOJ's name. The federal Department of Homeland Security's ("DHS") U.S. Citizenship and Immigration Services ("USCIS") appears, however, to have assumed officially the duties of the former DOJ Immigration and Naturalization Service on 1 March 2003 (four months before Gu filed Husband's and Wife's documents). *Our History*, U.S. Citizenship and Immigration Servs., http://www.uscis.gov/about-us/our-history (last updated May 25, 2011).

information regarding his bank accounts. The Petition was approved by the DHS on 12 April 2005.[2]

In the meantime, in July 2004, the couple purchased a home together in Rockville, Maryland, and sold the separate homes in which they resided previously. The mortgage application contained detailed information regarding each party's income, assets, and liabilities. The couple had a single joint checking account that they used to pay expenses for the Rockville home and common living expenses, to which Husband contributed monthly $4,000 and Wife contributed monthly $2,000.

In 2005, the couple contracted to build a new house in Frederick, Maryland. They provided their financial information to the builder of the home and the mortgage lender, including their income, asset, and liability information, their credit report, and a mortgage loan application. By that time, Husband, who worked for the United States Department of Transportation at the time that the immigration Form I-864 Affidavit was completed in 2003, was working for the DHS.

---

[2] From what we can gather from the record, the approval of the Petition (and, presumably, the accompanying Form I-485 Application) resulted in Wife receiving conditional permanent resident status (i.e., a conditional Green Card). A conditional Green Card is given when one applies (and is approved) for permanent resident status based on a marriage that is less than two years old on the day that permanent resident status is granted. *Remove Conditions on Permanent Residence Based on Marriage*, U.S. Citizenship and Immigration Servs., http://www.uscis.gov/green-card/after-green-card-granted/conditional-permanent-residence/remove-conditions-permanent-residence-based-marriage.html (last updated June 3, 2010). A conditional Green Card is valid for two years, at which time the holder of the conditional status may apply for removal of the condition by filing a Form I-751 Petition to Remove Conditions on Residence. *Id.*

## II. The 2005 Marital Settlement Agreement

In September 2005, Wife discovered that Husband had an extra-marital affair. The couple discussed separation, deciding that the soon-to-be-completed Frederick home would be titled solely in Wife's name. They decided further that Husband would continue his monthly contributions of $4,000 to cover their mortgage and housing expenses. After agreeing on the terms, the couple sought to memorialize their agreement. Wife requested that Gu draft a Marital Settlement Agreement (the "2005 Agreement") regarding the parties' agreed upon division of marital property in the event of a separation.[3] Gu drafted the Agreement, based on the terms provided her by Wife, and sent it electronically to her. Wife, in turn, sent electronically the Agreement to Husband, who hand-wrote on a printed copy proposed revisions to ensure that the $4,000 monthly alimony payment for which Husband was responsible, according to the terms of the draft Agreement, would not increase if his salary increased, but would be reduced proportionate to his income in the event that he lost his job and obtained employment with lesser pay.

_____

[3] The parties offered conflicting testimony at the trial of the present litigation regarding Gu's representation in connection with the 2005 Agreement. Wife testified that she told Husband that Gu would be representing her, and that he chose to proceed without counsel because he did not want to pay for an attorney, believing himself to be capable of negotiating the Agreement. Husband testified that he thought Gu would be acting in the interests of both parties in drafting the Agreement, and that Wife told him not to bother Gu as she would take care of any necessary communications with Gu. The trial judge in the Circuit Court for Montgomery County found that Husband's testimony on that issue was not credible. Although Husband contends still that he thought Gu was representing his interests in connection with the 2005 Agreement, he does not argue that the Circuit Court committed clear error in finding that she did not represent him in that matter.

Gu drafted a final version of the Agreement, including Husband's revisions. The parties executed the Agreement on 18 October 2005. The Agreement addressed the parties' real property interests and alimony, but left other issues to be addressed at a later date. The initial draft and final version of the Agreement contained the following provision:

Independent Counsel

Wife hereby acknowledges that Yu Gu, Esquire has represented her in drafting and execution of this agreement. Husband acknowledges that he has been advised and afforded the opportunity to obtain independent counsel of his own selection in connection with this Agreement, so that he may have his own attorney answer any questions which he may have. Husband further acknowledges that Wife's attorney has neither represented Husband nor provided him with any legal advice in connection with the terms or operating effect of this Agreement. Finally, Husband acknowledges that his decision to execute this Agreement without his own attorney is made freely and voluntarily.

In executing the final Agreement, Husband initialed each page, including the page containing the independent counsel provision.

Gu was not present when the parties executed the Agreement. Gu did not communicate directly with Husband concerning the 2005 Agreement, nor did Husband contact, or communicate otherwise with, Gu. As it turned out, the parties did not separate after executing the 2005 Agreement. They sold their Rockville home and applied the proceeds of the sale toward the purchase of the home in Frederick. Title to the Frederick residence was placed solely in Wife's name, but the couple obtained the mortgage in their joint names. Husband and Wife moved into the Frederick home.

### III. The 2007 Immigration Proceeding

In 2007, Wife contacted Gu to remove the condition on Wife's permanent resident status resulting from the 2005 approval of the 2003 immigration filings. Removal of the condition required proof of a bona fide marriage by providing evidence of joint property held by Husband and Wife. To that end, Wife provided Gu with copies of the couple's federal income tax returns (filed jointly) for tax years 2003-2005, evidence of their joint home, automobile, and health insurance, joint utility bills, and documentation of their purchase and sale of the Rockville home and purchase of the Frederick home. Wife did not provide Gu with any information concerning Husband's individual finances. Gu prepared a Form I-751 Petition to Remove Conditions on Residence ("Form I-751 Petition"), which Wife (as Petitioner) and Husband (as Petitioner's Spouse) signed on 13 January 2007. On that same day, Husband and Wife signed a Notice of Entry of Appearance as Attorney or Representative authorizing Gu to file the Form I-751 Petition. Although he signed the necessary documents, Husband did not communicate directly with Gu regarding the filing of the Form I-751 Petition. Husband did provide information for the Petition to Wife, who provided the information, in turn, to Gu. Husband's then employer, the DHS, approved the Form I-751 Petition on 3 July 2007, removing the condition on Wife's resident status.

### IV. The 2008 Marital Settlement Agreement

In the Summer or Fall of 2007, Wife discovered that Husband was having another extra-marital affair. At that point, the parties commenced discussion of another settlement agreement to address the issues not resolved in the 2005 Agreement. A

significant point of contention was clarifying who would bear the income tax burdens associated with Husband's $4,000 monthly alimony payments to Wife provided for in the 2005 Agreement. Based on the parties' current discussions, Wife asked Gu to draft another agreement ("2008 Agreement"). Gu forwarded a draft Agreement to Wife, which she forwarded to Husband.

The parties partook in several discussions and electronic exchanges regarding the terms of the proposed 2008 Agreement. On 31 January 2008, Husband sent Wife an email stating that he wanted to "re-think this new settlement agreement. It is not a fair agreement to me." A few days later, on 4 February 2008, Husband emailed a marked-up version of the draft 2008 Agreement to Wife containing substantive and non-substantive revisions to several provisions. In the body of the email message, Husband stated:

> I have made the changes that we've agreed:
>
> 1. Made the non-taxable alimony period to be 3 years after separation;
> 2. Provide life insurance for $300K to you for 3 years after separation; and
> 3. Agreed to pay any tax liability for you for the non-taxable alimony payments;
>
> I hope to make this easy for you and Gu to review. Let me know what changes you would want. I will get the court paperwork to find out what I have to file.

The next day, Husband sent Wife another copy of the draft Agreement with two additional, minor grammatical edits. Wife told Gu she agreed to the changes and asked Gu to prepare a final draft. Gu emailed the final Agreement to Wife, who forwarded it to Husband.

On 8 February 2008, Husband and Wife executed the final 2008 Agreement. The drafts and final version of the 2008 Agreement contained the same independent counsel provision as in the 2005 Agreement. As with the 2005 Agreement, Husband initialed every page of the 2008 Agreement before signing it, including the page containing the independent counsel provision. Additionally, as with the 2005 Agreement, Gu was not present when the parties executed the 2008 Agreement.

## PROCEDURAL BACKGROUND

On 14 August 2009, Husband filed a Complaint for Judgment of Absolute Divorce and for Other Appropriate Relief (the "Complaint") in the Circuit Court for Montgomery County. In the Complaint, Husband alleged that the 2005 and 2008 Agreements (collectively, the "Separation Agreements") were "void and unenforceable," and requested that they be set aside. Wife filed an Answer to Husband's Complaint, on 14 September 2009, in which she maintained that the 2008 Agreement superseded the 2005 Agreement, resolved all issues between the parties, and was valid and enforceable. Accordingly, Wife requested that the 2008 Agreement be validated and incorporated, but not merged, into the Judgment of Absolute Divorce. On 17 September 2009, Husband filed a Motion to Set Aside Marital Settlement Agreements arguing that the Separation Agreements were unconscionable and entered into while the parties were still in a confidential relationship.

The Honorable Ronald B. Rubin presided over a hearing on Husband's Motion on 19 April 2010. Following testimony from the parties and Gu, Judge Rubin made, in sum, the following determinations: Gu did not at any time represent Husband in connection

-8-

with the immigration matters or either of the Separation Agreements; Husband's testimony, that he believed Gu represented him in connection with the Separation Agreements, was not credible; Husband was a sophisticated party who was overly modest in describing his "business acumen"; the Separation Agreements were the result of "intense, thorough, [and] thoughtful" negotiations, and "good faith[] give-and-take between the parties"; Husband knew he could seek independent counsel, but chose not to do so in order to save money; and, Husband bargained for the terms that he later sought to repudiate. Accordingly, Judge Rubin held that the Separation Agreements were not unconscionable and entered an Order, on 22 April 2010, denying Husband's Motion as to both Agreements. Following additional hearings on the merits of the grounds for the divorce before a Family Division Master, the Circuit Court docketed, on 20 May 2010, a Judgment of Absolute Divorce in which the Separation Agreements were incorporated, but not merged.[4]

On 11 June 2010, Husband filed timely a Notice of Appeal from the Circuit Court's Judgment. While that appeal was pending before the Court of Special Appeals, Husband filed a Motion to Revise the Circuit Court's 22 April 2010 Order based on evidence he obtained via a federal Freedom of Information Act ("FOIA") request.[5]

---

[4] The initial Judgment for Absolute Divorce described inaccurately the date of the 2005 Agreement, and, accordingly, the Circuit Court docketed an Amended Judgment on 4 June 2010.

[5] Husband filed a FOIA request, after the hearing on his Motion to Set Aside, to obtain copies of the Petitions that Gu filed with the federal government on behalf of Husband and Wife, because Gu was unable to produce them at the hearing in response to

(continued…)

Husband's appeal was stayed pending resolution of his Motion to Revise, which the Circuit Court denied on 22 December 2011. Husband noted an appeal of that denial on 24 January 2012. The stay on Husband's initial appeal was lifted and the two appeals consolidated by the Court of Special Appeals.

On 4 March 2013, the intermediate appellate court decided the appeals in a reported opinion affirming the Circuit Court's judgment. *Li v. Lee*, 210 Md. App. 73, 62 A.3d 212 (2013). With regard to the Circuit Court's denial of the Motion to Set Aside, the Court of Special Appeals held that the Circuit Court did not err in finding that the Agreements were not substantively unconscionable; that the Circuit Court erred in finding that no attorney-client relationship existed between Gu and Husband in connection with the immigration matters, but the immigration matters and Separation Agreements were not "substantially related," and therefore Gu could not have violated MLRPC 1.9 by neglecting to obtain Husband's informed consent, confirmed in writing, to her representation of Wife in connection with the Agreements; and, that the Separation Agreements were not unconscionable.

---

(…continued)

Husband's subpoena for her pertinent records. After obtaining copies of the original filing from the USCIS as a result of his FOIA request, Husband filed the Motion to Revise arguing that the newly obtained documents demonstrated that Husband was, in fact, Gu's client with regard to the immigration filings. Husband grounded his argument on the two Notice of Appearance filings, which bore Husband's signature, and a letter printed on Gu's law firm's letterhead stating that the filings were for "Tzu Lee on behalf of Mr. Shiping Li."

Husband filed timely a Petition for Writ of Certiorari in this Court, which we granted on 20 June 2013, *Li v. Lee*, 432 Md. 211, 68 A.3d 286 (2013), to consider the following question:

> Does an attorney's failure to [obtain] informed consent, confirmed in writing, pursuant to the Maryland Lawyers' Rules of Professional Conduct, render a separation agreement voidable at the election of the client who did not give informed consent, confirmed in writing?[6]

As discussed in detail below, we hold that, on this record, the Separation Agreements are not voidable according to the demand of Husband.

## STANDARD OF REVIEW

When, as in this case, an action is tried without a jury, "the appellate court will review the case on both the law and the evidence." Md. Rule 8-131(c). Although we "will not set aside the judgment of the trial court on the evidence unless clearly erroneous," *id.*, "[t]he legal analysis of the lower court . . . enjoys no deferential appellate review." *Helinski v. Harford Mem'l Hosp., Inc.*, 376 Md. 606, 614, 831 A.2d 40, 45 (2003).

---

[6] Husband phrased in his brief the single question presented in his Certiorari Petition as two questions:

> Did Attorney Gu's attorney-client relationship with Husband in the immigration matter require her to obtain Husband's informed consent, confirmed in writing, to her representation of Wife in the Family Matter?

> Are the Separation Agreements invalid, where they are the product of a conflict of interest, without informed consent, confirmed in writing?

ANALYSIS

Husband mounts two arguments. First, he argues that Gu was required, under the MLRPC, to obtain Husband's informed consent, in writing, to Gu's representation of Wife in connection with the Separation Agreements. Husband contends that Gu failed to obtain informed consent, and her failure to do so violated MLRPC 1.7 (duties to current clients),[7] or, in the alternative, Rule 1.9 (duties to former clients).[8] Second, Husband argues that Gu's failure to obtain his informed consent, in writing, renders the Separation Agreements voidable at his demand.

Wife ripostes with three counter-arguments. First, in response to Husband's allegation that Gu violated MLRPC 1.7, Wife maintains that Gu was not engaged in the representation of Husband while representing Wife with regard to the Separation

---

[7] Rule 1.7 reads, in pertinent part:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a conflict of interest . . .

> (b) Notwithstanding the existence of a conflict of interest under paragraph (a), a lawyer may represent a client if:
> . . .
>> (4) each affected client gives informed consent, confirmed in writing.

[8] Rule 1.9 reads, in pertinent part:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Agreements. Second, in response to Husband's alternative argument that Gu violated MLRPC 1.9, she contends that if Husband was Gu's former client in the immigration matters, the immigration and Separation Agreement matters were not "substantially related." Third, Wife argues that, even assuming Gu violated MLRPC 1.7 or 1.9, it is not an appropriate remedy, on this record, to set aside the Separation Agreements.

Because we agree, as explained below, with Wife's third argument, we need not decide here whether an MLRPC violation occurred. Nor do we need decide whether, if a violation occurred, it was a violation of MLRPC 1.7 or 1.9, because it makes no difference to the outcome of the case. The basis Husband alleges for the violation of each of the two Rules is the same—failure to obtain informed consent.[9]

Although there may be circumstances in which a conflict of interest pertaining to an attorney's current client could lead to the potential abuse of more confidential information than a conflict pertaining to a former client, such circumstances are not present in this case. Regardless of whether Gu's alleged representation also of Husband in the immigration matters was prior to, or concurrent with, the Separation Agreement matters, the record demonstrates that Husband provided Gu with a quite discrete and limited amount of confidential information on a limited number of occasions. Therefore, on this record, the failure to obtain informed consent from Husband (if he were a current

---

[9] Were we required to confront the merits of which Rule (if either) Gu may have violated, it is more likely that MLRPC 1.9 would be implicated. The Court of Special Appeals considered only whether a violation of MLRPC 1.9 occurred because it was not until Husband's Petition for Certiorari to this Court that he raised the question of whether Gu violated MLRPC 1.7. He did not invoke MLRPC 1.7 in the Circuit Court or the intermediate appellate court.

client) would not have a greater or lesser impact on the decision of whether to set aside the Separation Agreements than would the failure to do so if he were a former client.

Even assuming, for present purposes, that Gu violated either MLRPC 1.7 or 1.9 by failing to obtain Husband's informed consent, confirmed in writing, to her representation of Wife in the Separation Agreement matters, we are not persuaded that the Separation Agreements he signed should be set aside. Husband contends first that, because Gu did not communicate with him regarding the Separation Agreements, she "never even undertook any explanation of the risks of her conflicted representation." As a result, Husband claims, "the lack of [his] informed consent to Attorney Gu's conflicted representation of Wife stripped [him] of any meaningful choice in agreeing to the terms of the Separation Agreements."

The facts belie Husband's argument. Although Gu did not communicate directly with husband, both of the Separation Agreements he signed contained independent counsel provisions, which made clear that: (1) Gu represented Wife in connection with the Agreements; (2) Gu did not purport to represent Husband or provide him with any legal advice in connection with the Agreements; (3) Husband was advised to seek the assistance of independent counsel in connection with the Agreements and afforded the opportunity to do so; and, (4) Husband decided, "freely and voluntarily," to execute the Agreements without seeking the advice of independent counsel.

The fact that Husband retained counsel to assist in executing his separation agreement with his prior wife also indicates that he had some appreciation of the desirability and importance of receiving advice from his own counsel in connection with

negotiating and executing such agreements. The emails between Husband and Wife pertaining to the 2008 Agreement demonstrate that Husband took it upon himself to negotiate the terms of the Agreement alone. Perhaps the advice of independent counsel would have led ultimately to more favorable terms for Husband, but we do not conclude that Husband was deprived of meaningful choice due to Gu's limited participation. The Separation Agreements were not contracts of adhesion: the only thing preventing Husband from attempting to achieve more favorable terms was his informed and voluntarily decision to represent himself.

Additionally, the legal authorities on which Husband bases his argument are inapposite or distinguishable from the circumstances of the present case. Husband's reliance on *Hale v. Hale*, 74 Md. App. 555, 539 A.2d 247 (1988), and *Blum v. Blum*, 59 Md. App. 584, 477 A.2d 289 (1984), to support his assertion that Maryland courts have "repeatedly . . . been troubled by instances of attorney representation of both parties to a separation agreement without obtaining the necessary full disclosure or informed consent," is misplaced. Although *Blum* and *Hale* do stand for that proposition, they are not applicable to the present case.

*Blum* and *Hale* involved individual attorneys who agreed to represent both parties to the preparation of separation agreements. Here, Gu did not purport to represent Husband and Wife in connection with the Separation Agreements—the independent counsel provisions she included in the Agreements stated expressly that she was representing only Wife. Husband conflates what he claims to be Gu's dual representation of the couple in connection with the immigration matters with Gu's representation of

-15-

Wife only in the family law matters.  Unlike *Blum* and *Hale*, Husband never met with, or even communicated directly with, Gu in connection with the Separation Agreements.  *See Hale*, 74 Md. App. at 560, 539 A.2d at 249 (noting that Mr. and Mrs. Hale went together to the office of an attorney, who represented them in prior legal matters, to draft the terms of their separation agreement); *Blum*, 59 Md. App. at 589, 477 A.2d at 291 (same).  Despite Husband's testimony that he believed Gu represented him with regard to the Separation Agreements, the independent counsel provisions contained in the Separation Agreements combined with the undisputed fact that Gu did not communicate directly with Husband in connection with either of the Agreements contradict the notion that she acted as a dual representative for the parties in the two transactions.

Husband's reliance on *Atlantic Richfield Co. v. Sybert*, 295 Md. 347, 456 A.2d 20 (1983), fails for the same reasons.  He emphasizes from *Atlantic Richfield* the proposition that "generally a transaction in which a party is represented by an attorney who simultaneously represents adverse interests will not be set aside if the client, after *full disclosure* by the attorney, voluntarily and knowingly consents to enter into the transaction."  295 Md. at 356, 456 A.2d at 25 (emphasis added in Husband's brief).  *Atlantic Richfield* involved, however, two lawyers from the same law firm who each represented an adverse party in the same real estate transaction.  295 Md. at 350, 456 A.2d at 21-22.  Moreover, we concluded in *Atlantic Richfield* that the agreement at issue should not be set aside because the client seeking to invalidate the agreement was aware fully of the dual representation when that client "voluntarily and knowingly consented" to the terms of the agreement, and there were no potential pitfalls related to the lawyers'

limited role in the transaction that would require advice to seek independent counsel. 295 Md. at 360-61, 456 A.2d at 27.

Here, Gu did not represent both Husband and Wife in connection with the Separation Agreements. Although representation of Wife in an adversarial family law transaction during or after representation of Wife and Husband in an immigration matter would be fraught with peril, hence the need for the informed consent provisions in MLRPC 1.7 and 1.9, those dangers are distinguishable, to some extent, from the dangers arising out of the type of dual representation at issue in *Atlantic Richfield* (as well as in *Hale* and *Blum*). Furthermore, Gu made Husband aware, by and through the independent counsel provisions, that she was not representing his interests in connection with the Agreements and that it would be prudent of him to seek the advice of his own counsel. Husband consented, voluntarily and knowingly, to the terms of the Agreements without choosing to seek such advice or representation.

The final precedent on which Husband pins his hopes is *Post v. Bregman*, 349 Md. 142, 707 A.2d 806 (1998). Husband highlights from *Post* the propositions that the MLRPC "constitutes an expression of public policy having the force of law" outside of the attorney disciplinary context, and that "clear and flagrant" violations of the MLRPC may render a resulting agreement unenforceable. 349 Md. at 163, 168, 707 A.2d at 816, 818. Husband ignores, however, the part of our analysis in *Post* where we emphasized that a clear and flagrant violation of Rule 1.5(e) "*may* extend to holding fee-sharing agreements . . . unenforceable" in part because it would be "anomalous" to allow an attorney to enforce the same unethical fee-sharing agreement that would subject the same

-17-

attorney to professional disciplinary action.  349 Md. at 168, 707 A.2d at 818.  Here, assuming, *arguendo,* that Gu violated MLRPC 1.7 or 1.9, the anomaly discussed in *Post* is not present because Gu is not the enforcer of the Separation Agreements.

Perhaps more importantly, we explained in *Post* that our emphasis on the word "may" meant that the Rule was "not a *per se* defense," and that "merely technical, incidental, or insubstantial" violations of the Rule should not be grounds to invalidate otherwise valid agreements.  349 Md. at 168, 707 A.2d at 819.  We continued by noting that a portion of the MLRPC commentary concerning the scope of the Rules states, in pertinent part: (1) that a violation of a Rule should not "create any presumption that a legal duty has been breached"; and, (2) "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."  *Id.*

To the extent that we might be willing to extend the reasoning of *Post* to MLRPC Rules other than 1.5(e), we cannot conclude, on this record, that an assumed violation of MLRPC 1.7 or 1.9 by Gu would constitute the type of "clear and flagrant" violation that would require a court to set aside the resulting agreement.  For two reasons, we conclude that if a violation occurred in the present case, it was more of a "technical, incidental, or insubstantial" violation than a flagrant one.  First, although the Rules require that Gu explain sufficiently the nature of any conflicted representation to Husband and make a paper record of his consent, the existence of the independent counsel provisions in each agreement and Husband's acknowledgement of those provisions mitigates, to some extent, the failure to obtain his informed consent confirmed in writing.

Second, the record does not reveal a clear example of how Gu used adversely against Husband in connection with the Separation Agreements any truly confidential information she obtained through Wife in her representation of Husband and/or Wife in the immigration matters. It seems that most, if not all, of the information concerning Husband's finances that Wife provided to Gu in connection with the Form I-864 Affidavit filed in 2003 was stale, due to Husband's change in employment, by the time Gu drafted the 2005 Agreement. With regard to the Form I-751 Petition filed in 2007, the only information provided to Gu concerned Husband and Wife's joint finances, to which information each party had access and a right to disclose. Thus, the 2007 immigration matter did not result in Gu receiving any additional confidential information concerning Husband's individual finances. Even if husband is correct in his assertion that the proper question to ask in determining whether two representational matters are related substantially, with regard to a potential violation of MLRPC 1.9, is *if* confidential information could have been used in the adverse representation—as opposed to whether any such information was, in fact, used—the actual use (or not) of any such confidential information is, in our view, an appropriate consideration in the analysis of whether a violation of the Rule was a flagrant or a technical/incidental/insubstantial one. Furthermore, it is evident from Husband's discussions with Wife and his revisions to the Agreements that he was aware of, and agreed with, the provisions of the Agreements concerning his financial obligations at the time the Agreements were negotiated and executed.

Husband mounts no argument sufficient to demonstrate clear error in the Circuit Court's findings that Husband was aware of the benefits of obtaining independent counsel, that he chose voluntarily to forego the services of independent counsel, that he was a sophisticated party, and that the Agreements he negotiated were not unconscionable. In light of those findings, to allow Husband to set aside the Agreements he bargained for based on a violation of MLRPC 1.7 or 1.9 for failure to obtain informed consent, confirmed in writing, would be to allow him to use improperly the MLRPC as a sword or "procedural weapon." We hold that, on this record, even assuming a violation of either MLRPC 1.7 or 1.9 occurred, the Separation Agreements are not voidable by Husband.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**