*Thomas L. Lloyd v. Anna Cristina Niceta*, No. 934, September Term, 2021. Opinion by Sharer, J. Frederick, J.

**MARRIAGE AND POST-NUPTIAL AGREEMENTS – CONSIDERATION**
Post-nuptial agreements are valid contracts in Maryland. A post-nuptial agreement contains adequate consideration when the parties enter into the agreement as a means to continue the marriage and forego a suit for divorce after adultery.

**MARRIAGE AND POST-NUPTIAL AGREEMENTS – UNCONSCIONABLE**
Post-nuptial agreement was not substantively unconscionable where the redistribution of the parties' assets did not "shock the conscience" of the court even though it created a somewhat imbalanced distribution of assets.

**MARRIAGE AND POST-NUPTIAL AGREEMENTS – "LUMP SUM" PENALTY PROVISION FOR ADULTERY NOT AGAINST PUBLIC POLICY**
Seven million dollar penalty provision in post-nuptial agreement that was triggered if husband engaged in adultery was not against public policy in the absence of fraud, mistake, duress, or undue influence.

**MARRIAGE AND POST-NUPTIAL AGREEMENTS – "LUMP SUM" PENALTY PROVISION FOR ADULTERY NOT UNCONSCIONABLE**
Seven million dollar penalty provision in post-nuptial agreement that was triggered if husband engaged in adultery was not unconscionable given the parties' assets and that husband controlled whether the provision was triggered.

Circuit Court for Montgomery County
Case No. 165376FL

_____


THOMAS L. LLOYD

v.

ANNA CRISTINA NICETA


_____

Graeff,
Nazarian,
Sharer, J. Frederick
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Sharer, J.
_____

Filed: October 26, 2022

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

On October 23, 2019, Anna Niceta filed a complaint for divorce in the Circuit Court for Montgomery County, from Thomas Lloyd, her husband of 13 years. Mr. Lloyd filed a cross-complaint. The court divided the issues presented into three areas: the validity of the parties' post-nuptial agreement; custody of their two children; and the divorce. After separate trials, the court ruled that the post-nuptial agreement was valid, in part; the parties consented to a custody order; and the court granted Ms. Niceta a divorce on the grounds of adultery.

The primary issue of this appeal is the validity of the post-nuptial agreement. Mr. Lloyd raises the following questions for our review, which we have slightly rephrased:

I.     Did the circuit court err in enforcing the post-nuptial agreement because it: A) lacked consideration; B) was unconscionable; or C) was procured by undue influence and/or unfair because the parties were in a confidential relationship?

II.    Did the circuit court err in upholding the "lump sum" section of the post-nuptial agreement because it was: A) a penalty and contrary to public policy; B) exceeded Mr. Lloyd's ability to pay; or C) unconscionable?

In her cross-appeal, Ms. Niceta raises the following questions, which we have slightly rephrased:

I.     Did the circuit court err when it failed to determine Mr. Lloyd's income before ruling that Mr. Lloyd owed no additional duty of child support beyond what he was already paying under the terms of the post-nuptial agreement?

II.    Did the circuit court err when it determined that a provision of Mr. Lloyd's trust account that barred the trustee from distributing trust assets to discharge legal obligations prevented the court from ordering Mr. Lloyd to pay child support that he could only pay by using the assets of the trust?

For the reasons that follow, we shall affirm the circuit court's judgments as to the issues raised by appellant. As to the issues raised by appellee in her cross-appeal, we shall remand for further proceedings.

## BACKGROUND FACTS

In 2006, Mr. Lloyd and Ms. Niceta, college graduates, married at the ages of 29 and 35, respectively. They had two children: a daughter born in 2008 and a son born in 2010. During much of their marriage, Mr. Lloyd, who held a financial planning certificate from Georgetown University, worked as an advisor in wealth management. His annual income varied from a low of $70,000 to a high of $100,000. Ms. Niceta was employed as an account executive for a catering company and earned a commission that ranged between $130,000 to $200,000 per year.

The parties established a standard of living above their earned income because of Mr. Lloyd's inherited money. His grandmother, Rachel "Bunny" Mellon, was a well-known socialite and philanthropist, who in 2010, gave Mr. Lloyd one million dollars to purchase a house for his family in Arlington, Virginia. Mrs. Mellon died in March 2014, and Mr. Lloyd received a substantial inheritance in two installments. The first installment occurred upon her death and totaled about $5.3 million. The second installment was received in May 2016, when Mr. Lloyd turned 40, and totaled about $5.4 million.

On June 2, 2014, a few months after Mr. Lloyd's grandmother died, Ms. Niceta discovered that Mr. Lloyd was having an affair. She was "devastated," and the parties separated. After several months, the parties began the process of reconciling, although Ms.

2

Niceta was still unsure whether she wanted to continue the marriage. In the fall of 2014, Ms. Niceta asked Mr. Lloyd to re-title his existing financial accounts, then titled in his name only, as tenants by the entirety accounts. He complied with her request. After the new year, Ms. Niceta advised Mr. Lloyd that for her to feel secure in a future together, they should enter into a post-nuptial agreement (the "Agreement"). Ms. Niceta retained two attorneys who began drafting the Agreement. Mr. Lloyd likewise retained two attorneys, both members of the Virginia bar, Ms. Deborah Cochran, who specialized in estate planning, and Ms. Julie Day, who specialized in family law. At that time, the parties were residents of Virginia.

During Mr. Lloyd's conversations with Ms. Day, he told her that his highest priority was "[m]aintaining an intact family unit for his children and regaining the trust of his wife after their marital difficulties." He expressed his desire to have the Agreement done as soon as possible and that he was willing to agree to any terms. He told her that Ms. Niceta had said that reconciliation was only possible if they signed an Agreement. He also told her that "he knows all of the finances and [Ms. Niceta] knows little." In sharing his financial situation, Mr. Lloyd gave his attorneys copies of his father's trust documents that provided that he would receive, among other things, a home on Cape Cod upon his father's death.

A draft Agreement circulated by Ms. Niceta's attorneys contained a "lump sum" clause that stated that if Mr. Lloyd engaged in inappropriate sexual behavior he would pay to Ms. Niceta $5 million. Mr. Lloyd advised Ms. Day that he wanted to increase the "lump sum" clause from $5 million to $7 million, as a "showing of his good faith" toward his

3

wife.[1]  Ms. Day explained: "He wanted more money put on it because that would make it that much more clear that he really wouldn't engage in those behaviors again[.] … That's why he wanted the money to be higher."

The parties and their attorneys met together on two occasions to negotiate the terms of the Agreement.  Before the first meeting, Ms. Day had an hour-long telephone conversation with Mr. Lloyd in which she shared her edits and concerns regarding the draft the parties were working from, and he provided comments.

The first meeting of the parties and their attorneys occurred on June 16, 2015, and lasted more than four hours, during which they reviewed the first draft of the agreement, line by line.  After the meeting, Ms. Day sent Mr. Lloyd a revised draft.  In advance of their second meeting, he provided comments to her on the revised draft.  The second meeting occurred a month after the first, during which the parties and their attorneys reviewed the revised draft line by line.  That meeting lasted more than six hours.  Mr. Lloyd provided information at that meeting that, among other things, his father's estate was valued at about $50 million and that he expected to receive, after taxes, about $12 million.  At that time, his father was 78, was attended to by an aide, and was in very poor health.  At trial, Mr. Lloyd admitted that both of his attorneys advised him against signing the Agreement, and in particular, they opposed the increase in the lump sum payment from $5 million to $7 million.

---

[1] At trial, Mr. Lloyd testified that Ms. Niceta had suggested increasing the lump sum payment from $5 million to $7 million but had wanted him to present it to his attorney as his idea.  Ms. Niceta denied this.

By August 2015, Ms. Niceta and Mr. Lloyd had bought a new home in Chevy Chase, Maryland and began living together again as a family, had enrolled the children in a new school, were vacationing and spending time together, and were continuing the effort of reconciliation and finalizing the post-nuptial agreement.[2]  To this end, Mr. Lloyd had sold his car that he had used with his paramour; followed through with his earlier plans to get a vasectomy; and took steps to convert to Catholicism, which was Ms. Niceta's faith.  The parties continued meeting with various marriage counselors.

On September 18, 2015, the parties executed a 25-page "Marital Agreement", which resolved certain issues in the event of a separation and divorce.  The Agreement began by naming the parties and their two children.  The Agreement then states:

> WHEREAS, the parties do not contemplate a suit for divorce at this time, but instead remain desirous of continuing the marriage.  However, by this Agreement the parties do resolve certain rights regarding equitable distribution as more fully set forth herein;
>
> WHEREAS, Husband committed adultery with [his paramour], which was discovered by Wife on June 2, 2014.  The parties acknowledge that Husband's adultery is in complete contravention of their marriage, and that Wife is working on forgiving the Husband for such adultery.  As more fully set forth below, Husband affirms that he shall not have any further contact, including but not limited to: in-person meetings, emails, text messages, letters, and telephone calls, with [his paramour] in the future; he shall not initiate or engage in any Inappropriate and/or Immoral Conduct as defined in Paragraph 10(A)(3) herein with [his paramour] or any other party outside of the marriage of the parties similar to the relationship he engaged in with [his paramour]; and he shall not engage in intentional viewing of pornographic or sexually explicit pictures and videos for so long as the parties remain married;

---

[2] Between June 2014 and September 2015, Mr. Lloyd took his daughter on a father-daughter trip to New Orleans and took both children to New York.  During the summer of 2015, they also traveled as a family to Jamaica and Cape Cod.

5

WHEREAS, whether or not the parties reconcile, each party wants to enter into this Agreement. The parties desire to settle by agreement certain of their rights, interests, and obligations between them and to resolve claims or demands each might have against the other now and in the future as to those provisions set forth below, and each party is entering this Agreement voluntarily and by his or her own free will and choice.

WHEREAS, the parties contemplate that this Agreement will be offered in a court of competent jurisdiction in which their rights and obligations may be decided at a later time as a partial property settlement agreement, in the place of any court determined resolution of the matters that are expressly set forth in this Agreement.

(Emphasis added.) The Agreement, which has a severability clause, contained the following terms, which we summarize:

1. In the event of divorce, the parties waive any claim to any right of equitable distribution as to any property addressed in the Agreement;

2. If the parties divorce, Husband will convey the "marital residence" to wife; pay off the mortgage within 60 days of a divorce order; and pay the taxes, insurance, and repairs over $2,000 on the residence until their son turns 22 years of age;

3. The first installment of husband's inheritance from his grandmother shall remain titled as tenants by the entirety during their marriage and shall be split evenly between the parties in the event of a divorce. Husband's expected second inheritance installment from his grandmother shall be placed in an account titled tenants by the entirety and in the event of divorce the property shall be evenly split between the parties;

4. Liquid assets from any other inheritance husband receives during their marriage shall be placed in an account titled in the names of both parties as tenants by the entirety and in the event of divorce, the parties shall split those assets evenly. Non-liquid assets that husband inherits during the marriage shall remain in husband's sole name during the marriage and shall remain his sole property upon divorce;

5. If the parties divorce, husband may spend any subsequent inheritance at his discretion, except on any subsequent girlfriend, wife, or child;

6. The proceeds of the sale of a particular brooch husband inherited from his grandmother, which occurred on April 21, 2015 for $850,000, shall

be transferred into the children's educational accounts titled in both parties' names as tenants by the entirety. In the event of divorce, the accounts shall become the wife's "sole and separate property[,]" but she agrees to be bound by the terms on those accounts that the monies shall only be used for the benefit of their children's general welfare;

7. Husband shall maintain and continue to pay wife's long-term health care policy in the yearly amount of $13,739, although husband may petition to terminate payment if he is unable to meet those obligations;

8. Husband shall maintain and continue to pay for as long as each party is living the following life insurance policies: three on husband's life with wife as sole beneficiary; two on wife's life for the sole benefit of the children; and one on each child's life with each parent as equal beneficiaries.

Additionally, and of particular importance to this case, was paragraph 10, which provided:

10. **<u>LUMP SUM MONETARY AWARD.</u>**

   A. This provision shall only be effective only in the limited situation that any one of the following conditions are satisfied:

   (i) If Husband is found by a preponderance of the evidence to have committed adultery, buggery or sodomy with any person;

   (ii) If Wife proves by a preponderance of the evidence that Husband initiated any contact, including, but not limited to, in-person meetings, emails, text messages, correspondences and telephone calls, with [his paramour]. However, Husband shall be held harmless for the following, and the same shall neither be deemed to be contact initiated by Husband nor make this provision effective:

   a. Husband responding to any contact initiated by [his paramour] provided that his response directs [his paramour] to stop contacting him, his family, his colleagues, or any of his business interests.

   (iii) If Husband is found by a preponderance of the evidence to have engaged in any Inappropriate and/or Immoral Conduct of the following with any other person, including, but not limited to: inappropriate emails; sexting; sending

7

pornographic pictures of himself to the other person; receiving pornographic pictures of the other person; romantically kissing, hugging, fondling, or embracing another person; keeping secret email, cell phone or credit card accounts; or engaging in sexual acts with another person even if it does not lead to intercourse.

B. If Wife proves by a preponderance of the evidence that Husband has engaged in any of the conduct as set forth above in subparagraph 10.A, Husband shall make a tax-free transfer to Wife of SEVEN MILLION AND 00/100 DOLLARS ($7,000,000.00) within ninety (90) days of such findings. If the parties remain married, said transfer shall be a permanent gift between husband and wife; if the parties divorce, this transfer shall constitute a lump sum monetary award not subject to taxation under the terms of the Internal Revenue Code. The transfer shall be made from Husband's 50% share of the Column B Assets.

The parties signed the Agreement and initialed each page.

Mr. Lloyd's father died in March 2017.[3] In October 2018, Mr. Lloyd commenced a second affair that Ms. Niceta discovered in April 2019. The parties separated, and Ms. Niceta subsequently filed for an absolute divorce on the grounds of adultery, asking that the Agreement be incorporated into the divorce judgment. Mr. Lloyd filed a countercomplaint seeking rescission of the Agreement.

---

[3] Mr. Lloyd's father's assets were distributed pursuant to a trust. Under the terms of that trust, certain real property located in Osterville, Massachusetts was distributed to the "Descendant's Separate Trust" for the benefit of Mr. Lloyd. After monetary gifts to various persons, the remainder of Mr. Lloyd's father's trust was to be divided per stirpes between Mr. Lloyd and his brother to their respective Descendant's Separate Trusts. The parties have given various values for those assets. At trial, Ms. Niceta's counsel stated that the value was about $26.8 million. As stated in the body of the opinion, when the parties were negotiating the Agreement, Mr. Lloyd told Ms. Day that he expected to inherit about $12 million from his father. It is unclear whether this amount included the value of the house in Osterville.

As explained above, the evidentiary issues were separated. A three-day trial was held in November 2020 on the validity of the Agreement. Ms. Niceta, Ms. Day, and Mr. Lloyd testified, among others. The court delivered oral findings in January 2021, striking those provisions restricting husband's ability to spend his money on a future girlfriend, wife, or child but otherwise finding the Agreement valid and enforceable. The court heard the merits of the grounds for divorce in March 2021.[4] In October 2021, the court entered a judgment of absolute divorce that incorporated the Agreement, except for the provisions that had been deemed invalid. Mr. Lloyd filed this timely appeal and Ms. Niceta has cross-appealed. We shall provide additional facts where necessary.

## DISCUSSION

### Standard of Review

We review an action tried without a jury on both the law and the evidence. Md. Rule 8-131(c). We will not set aside a trial court's judgment on the evidence "unless clearly erroneous," giving "due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.* We view the evidence in the light most favorable to the party who prevailed at trial, and we resolve all evidentiary conflicts in their favor. *Brault Graham, LLC v. Law Offs. of Peter G. Angelos, P.C.*, 211 Md. App. 638, 660 (2013). In contrast, we review whether "the [trial] court's conclusions are legally correct under a *de*

---

[4] The parties had agreed to a custody/parenting plan with Ms. Niceta to have primary physical custody, the parties to have joint legal custody, and Mr. Lloyd to have access as agreed to in the parenting plan. The parties do not appeal the Consent Custody Order.

9

*novo* standard of review." *Nouri v. Dadgar*, 245 Md. App. 324, 343 (2020) (quotation marks and citations omitted).

**I.**

Mr. Lloyd first argues that, contrary to the circuit court's ruling, the Agreement was void because it: 1) lacked consideration; 2) was unconscionable; or 3) was procured by undue influence. Ms. Niceta argues that the Agreement contained adequate consideration; was not unconscionable; nor was it procured by undue influence. We shall address each argument in turn.

There is little law in Maryland and in our sister jurisdictions regarding the validity of post-nuptial agreements, particularly in comparison to ante-nuptial agreements. However, the Court of Appeals has recently, and broadly, stated, that post-nuptial agreements, which "look a lot like pre[-]nuptial agreements[,]" are contracts between a married couple "'that sets forth the rights, duties and responsibilities of the parties during and upon termination of the marriage through death or divorce.'" *McGeehan v. McGeehan*, 455 Md. 268, 297 (2017) (quoting Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law § 14-15 (6th ed. 2016)).

In *McGeehan*, the Court of Appeals was asked to decide whether certain real property came within the purview of an oral post-nuptial agreement the parties entered into during a time of crisis in their marriage. The Court stated that in both pre-nuptial and post-nuptial agreements the couples are "'trying to assure that their financial situation is certain and predictable[,]'" but in post-nuptial agreements the couples often "'attempt to use financial rewards and penalties to create incentives during a marriage that constrain the

10

behavior of both spouses.'" *Id*. at 297-98 (quoting Sean Williams, *Postnuptial Agreements*, 2007 Wis. L. Rev. 827, 835 (2007)). Such agreements are "'generally held to be binding when they are shown to be fair and regular and not unconscionable or the product of fraud, duress, mistake or undue influence; and certainly when they have been fully executed they will be given effect.'" *Id*. at 298 (quoting 5 Richard A. Lord, Williston on Contracts § 11:7 (4th ed. 2009)). With this in mind, we shall turn to the parties' specific arguments.

## A. Did the Agreement lack consideration?

In its oral opinion, the trial court observed:

> In this case, Mr. Lloyd argues there was no consideration given by Ms. Niceta. Mr. Lloyd argues that the terms of the agreement overwhelmingly favor Ms. Niceta. On this point, he is correct but what the evidence established is that Mr. Lloyd committed adultery which he admitted on June 2, 2014. This established grounds for divorce which means Ms. Niceta elected not to pursue and instead agreed to work on reconciling the marriage. As the third whereas clause in the agreement states, quote the parties do not contemplate a suit for divorce at this time but instead remain desirous of continuing in the marriage. The evidence shows that she did. She contacted a priest with whom she had confidence to help them deal with the emotional pain she was enduring. Mr. Lloyd also interacted with the priest and with plaintiff's therapist. They began to spend more time together and they traveled together. They resumed living together and purchased the Chevy Chase house together. I recognize that these acts occurred before the signing of the agreement but I think that's what happens in a family situation. Ms. Niceta agreed to continue to work on the marriage and to continue to work towards a reconciliation. This was her promise.
>
> If she had not, I believe the defendant would have had [a] cause of action or breach and would have been able to seek appropriate remedies from the court. I also note that the agreement states and I quote for and in consideration of the mutual promises contained in this agreement and other good and valuable consideration, the receipt of and sufficiency of which is hereby acknowledged. So I do not find that the plaintiff's promise to work towards a reconciliation to be [illusory] and I find that there was consideration.

11

Before this Court, Mr. Lloyd argues that the Agreement is not valid because it is not supported by consideration as it contains "no meaningful act, forbearance, or promise made by Wife[.]" He argues that the language in the Agreement that she is working on "forgiving the Husband for such adultery" is merely an illusory promise and too indefinite to be enforceable. He argues that the court erred in finding adequate consideration in her decision to reconcile the marriage upon discovering his adultery because "past acts cannot form the requisite consideration." Lastly, he argues that her waiver of equitable distribution of property under the Agreement in the event of divorce did not constitute adequate consideration because the distribution of property under the Agreement was to her benefit. Ms. Niceta responds that releasing her right to sue for divorce after the discovery of the affair was valid consideration for the Agreement. Additionally, her promise to work on forgiving her husband of his adultery was also valid consideration and not an illusory promise.

"It is basic contract law that courts generally will not inquire as to the adequacy of consideration." *Vogelhut v. Kandel*, 308 Md. 183, 190 (1986). The Court of Appeals has said that:

> It is not the province of the Courts to interfere with the natural right of parties to contract, and to exercise their own will and judgment upon the subject; and they will have the power to estimate the value of the consideration and the benefits to be derived from their contracts, where there is no incompetency to contract, no fraud or surprise, and no rule of law is violated.

*Id*. at 191 (quotation marks and citation omitted). *See also Shriver v. Druid Realty Co. of Baltimore City*, 149 Md. 385, 391 (1926) ("Parties contracting must determine for themselves the value and benefit of the consideration[.] . . . While there must be some

12

consideration . . . it is sufficient if it be slight, or may be valuable to the party promising."). Moreover, "a recital of facts which may constitute consideration in an unsealed written agreement, is prima facie evidence of those facts[,]" although the "parol evidence rule does not prevent a rebuttal of the truth of that statement by extrinsic evidence." *Reece v. Reece*, 239 Md. 649, 658 (1965).

The Agreement provides that "the parties do not contemplate a suit for divorce at this time, but instead remain desirous of continuing the marriage" and "that Wife is working on forgiving the Husband for such adultery." We believe these statements met the consideration requirement to constitute an enforceable contract.

It is well-settled that the forbearance of bringing a legal action is a form of consideration. *See Shimp v. Shimp*, 287 Md. 372, 384 (1980) ("[T]he parties may agree on the surrender or acquisition of any legal rights as consideration[.]" (quotation marks and citation omitted)). Therefore, Ms. Niceta's decision not to file for divorce and to remain in the marriage following discovery of her husband's adultery, and work on reconciling the marriage, is adequate consideration for the Agreement. *Cf. Hall v. Hall*, 27 N.E.3d 281, 285-86 (Ind. Ct. App. 2015) ("[T]he extension of a marriage that would have otherwise been dissolved but for the execution of an agreement to reconcile" is adequate consideration to support a reconciliation agreement. (quotation marks and citation omitted)); *In re Marriage of Tabassum & Younis*, 881 N.E.2d 396, 407-409 (Ill. App. Ct. 2007) (physical separation not necessary for a finding of consideration in executing a post-nuptial agreement where the parties were undisputedly having marital difficulties when they signed the agreement); *Zagari v. Zagari*, 746 N.Y.S.2d 235, 238 (N.Y. Sup. Ct. 2002)

13

(desire to continue marriage was sufficient consideration for a post-nuptial agreement); and *Gilley v. Gilley*, 778 S.W.2d 862, 864 (Tenn. Ct. App. 1989) (where wife agreed not to prosecute a divorce action against her unfaithful husband in exchange for an agreement setting forth property distribution if the parties later divorced, wife supplied consideration, and court upheld agreement).

We recognize that other jurisdictions are inclined to not find adequate consideration where the parties enter into a post-nuptial agreement when they are not having marital difficulties. In *Bratton v. Bratton*, 136 S.W.3d 595, 603 (Tenn. 2004), the Tennessee Supreme Court refused to enforce a post-nuptial agreement, holding that the wife did not give adequate consideration for the agreement even though she stated in the agreement that she promised to remain in the marriage. The court stated that "[c]onsideration exists when a party does something that he or she is under no legal obligation to do or refrains from doing something which he or she has a legal right to do." *Id*. at 602. The court recognized that because each spouse has a legal right to bring an action for divorce, when one spouse promises not to bring such an action, that spouse is presumably "refrain[ing] from doing something which he or she has a legal right to do." *Id*. Nonetheless, the court held that Ms. Bratton's promise to remain in the marriage was not a "meaningful act" because the spouses were not having "marital difficulties" at the time they signed the post-nuptial agreement. *Id.* at 603-04. *See also Whitmore v. Whitmore*, 8 A.D.3d 371, 372 (N.Y. App. Div. 2004) (mere continuation of marriage was not adequate consideration for post-nuptial agreement in which wife released claims on husband's property). *See also* 7 Richard A. Lord, Williston on Contracts § 16:20 (4th ed. 2010) ("[I]f there is no justification for

14

divorce or separation, an agreement to continue or resume marital relations certainly lacks consideration[.]").  *Contrast with* Uniform Premarital and Marital Agreements Act (providing that a post-nuptial agreement is enforceable without consideration).

We need not decide whether the desire to remain in a marriage without marital difficulties is by itself sufficient consideration to uphold a post-nuptial agreement because that is not the situation before us.  Following discovery of husband's infidelity, Ms. Niceta promised not to file suit, to stay in the marriage, and work on forgiving her husband.  We agree with Mr. Lloyd that generally "past consideration is insufficient to support a present promise" but her promise to not file for divorce, to stay in the marriage, and to work on forgiving her husband is not a past promise but a continuing promise.  *Reece*, 239 Md. at 659.  Moreover, the promises were not illusory under the circumstances because there was no allegation of bad faith regarding her promises.  Therefore, under the circumstances presented, we hold that Ms. Niceta's promises were adequate consideration to constitute an enforceable contract.

## B.  Was the Agreement unconscionable?

The trial court opined extensively on the question of unconscionability, both procedural and substantive, in its review of applicable Maryland law, the burden of proof, and, relative to this matter, the valuation of assets that Mr. Lloyd agreed to convey to Ms. Niceta, including the $7 million "penalty," and concluded that, with the exception of restriction of certain future conduct, the Agreement was not void as unconscionable.

Mr. Lloyd argues that the Agreement is unenforceable because it was unconscionable for two reasons: (1) it produced a gross disparity in the financial

15

circumstances of the parties and (2) placed financial obligations on him that were impossible to perform. Ms. Niceta responds that the Agreement was not unconscionable as it neither produced a gross financial disparity between the parties nor was impossible for him to perform.

A contract is void if it is unconscionable, a term that encompasses both procedural and substantive unconscionability. *Freedman v. Comcast Corp.*, 190 Md. App. 179, 207-08 (2010). Both aspects – procedural and substantive – "must exist for a court to decline to enforce" a contract.[5] *Rankin v. Brinton Woods of Frankford, LLC*, 241 Md. App. 604, 621-22 (2019) (citing *Doyle v. Fin. Am., LLC*, 173 Md. App. 370, 383 (2007)). Procedural unconscionability can be found when one party lacks meaningful choice *in the formation* of the contract; substantive unconscionability is found when the *terms* are "so one-sided as

_____

[5] We note that, relying on *Li v. Lee*, 210 Md. App. 73, 98-99 (2013), *aff'd*, 437 Md. 47 (2014), both the circuit court and Mr. Lloyd's trial attorney seem to have been under the impression that only one aspect of unconscionability must be present for a contract to be found unconscionable. In *Li,* we acknowledged that both aspects of unconscionability must be present to invalidate a contract. *See id.* at 112. Maryland law is clear that both aspects of unconscionability must exist before a court will set aside a contract. *See Walther v. Sovereign Bank*, 386 Md. 412, 426 (2005); *Rankin*, 241 Md. App. at 621-22; *Stewart v. Stewart*, 214 Md. App. 458, 478 (2013); and *Doyle*, 173 Md. App. at 383.

Because the circuit court ruled that the Agreement was not substantively unconscionable, Mr. Lloyd focuses his appeal on substantive unconscionability but hedges his bets by arguing in a footnote in his appellate brief that "the evidence presented at trial is more than sufficient for this Court to conclude that the Agreement is both substantively and procedurally unconscionable." Because we ultimately agree with the circuit court that the Agreement was not substantively unconscionable, and because Maryland law requires the presence of both aspects of unconscionability to find a contract unconscionable, we need not decide whether the Agreement was also procedurally unconscionable.

16

to shock the conscience of the court." *Li*, 210 Md. App. at 112 (quotation marks and citation omitted). We have explained further:

> Procedural unconscionability "concerns the process of making a contract and includes such devices as the use of fine print and convoluted or unclear language, as well as deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms." *Stewart v. Stewart*, 214 Md. App. 458, 477 (2013) (internal quotations and citation omitted).

> Substantive unconscionability, on the other hand, "refers to contractual terms that are unreasonably or grossly favorable to the more powerful party and includes terms that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law[.]" *Stewart*, 214 Md. App. at 477-78 (internal quotations and citation omitted). They are "provisions that seek to negate the reasonable expectations of the nondrafting party, and terms unreasonably and unexpectedly harsh . . . having nothing to do with . . . central aspects of the transaction." *Id*. at 478.

*Rankin*, 241 Md. App. at 622. "The burden of establishing the presence of both is on the party challenging the … agreement." *Stewart*, 214 Md. App. at 478. Unconscionability is determined as of "the time the contract was entered." *Id.* (quotation marks and citation omitted). *See also Martin v. Farber*, 68 Md. App. 137, 144 ("[T]he fairness of an agreement is to be determined as of the time it was made, not on the basis of conditions occurring subsequently."), *cert. denied*, 308 Md. 237 (1986).

Mr. Lloyd argues on appeal that the circuit court's ruling was in error because the court erroneously failed to attribute certain assets listed in the Agreement to Ms. Niceta. Specifically, he asserts that the circuit court should have counted among Ms. Niceta's assets the Arlington house; ½ of the first installment of his grandmother's inheritance; the brooch proceeds; and the $7 million lump sum payment. According to Mr. Lloyd, if those items were viewed as Ms. Niceta's assets, the Agreement produced a "shocking" financial

17

disparity and was therefore void. Under his calculations, at the time the Agreement was signed he would have been roughly $1.2 million in debt and Ms. Niceta would have assets of roughly $15 million. We find no error in the circuit court's decision not to attribute those assets to Ms. Niceta under the Agreement. Further, because we review the concept of "shocked conscience" under an abuse of discretion standard, we find no reason to conclude that the trial court abused its discretion in its conclusion that its conscience was not shocked by the somewhat imbalanced distribution of assets under the Agreement. We explain.

**Arlington Property**. The Agreement provides that upon divorce, Ms. Niceta shall receive the "Marital Residence" and then states that their marital residence is their home in Arlington, Virginia. However, the evidence elicited at trial showed that several weeks before signing the Agreement, the parties purchased a property (for $2.25 million) in Chevy Chase, Maryland, with the intent that it was to become their marital home; that at the time they signed the Agreement, the parties were temporarily living in Washington, D.C. while the Chevy Chase house was being renovated; and that the parties sold the Arlington property ten months after signing the Agreement. Given the facts presented, the circuit court found that when the Agreement was signed, the parties intended the Chevy Chase property to be their marital residence. Therefore, the circuit court ruled that the Chevy Chase property was covered by the Agreement but not the Arlington property. As a result, the circuit court ruled that the value of the Chevy Chase property became part of Ms. Niceta's assets under the Agreement.

18

Mr. Lloyd does not challenge the circuit court's findings of fact that the parties intended the Chevy Chase house to be their marital residence. Instead, he seemingly argues that the Arlington property should be distributed to Ms. Niceta, in addition to the Chevy Chase property. We agree with the circuit court that when the "Marital Residence" provision of the Agreement is read as a whole, it was the clear intention of the parties that Ms. Niceta would receive only "the marital residence" and there is nothing to suggest that the parties intended for Ms. Niceta to receive more than one house in the event of divorce. Accordingly, we find no error by the circuit court in ruling that the Chevy Chase residence was covered by the Agreement and the Arlington residence was not.

**First Installment of Inheritance**. Mr. Lloyd argues that the trial court erred in not including half of the first installment of his inheritance from his grandmother as an asset of Ms. Niceta. He argues that in determining whether an unconscionable outcome results in upholding the Agreement, we must consider the parties' respective financial positions overall, which includes assets not affected by the Agreement. We disagree.

In determining whether the Agreement was substantively unconscionable, we look to the *terms of the* agreement and the assets each party is to receive *under the* Agreement. *See Hale v. Hale*, 74 Md. App. 555, 561 (1988) (an unconscionability analysis requires assessment of the assets passing to the parties under a separation agreement).[6] At the time

---

[6] It is argued by Ms. Niceta, citing *Hale, supra*, that we consider only those assets divided pursuant to the Agreement. In contrast, Mr. Lloyd argues that the court ought to have considered the parties' overall financial position before and after the effective date of the Agreement. We conclude that the parties, in negotiating the terms of the Agreement, and in executing the Agreement, clearly took into account their respective financial positions.

19

the Agreement was executed, the first installment of the inheritance had already been distributed to Mr. Lloyd and deposited into the parties' tenants by the entirety account. Therefore, the circuit court correctly decided to not include the value of this asset as a transfer to Ms. Niceta under the Agreement because the transfer had been completed prior to the execution of the Agreement.

**Brooch Proceeds**.  Mr. Lloyd argues that the circuit court erred in not including the brooch proceeds as an asset of Ms. Niceta under the terms of the Agreement because the asset "operates solely to benefit Wife."  We find no error.  Although the proceeds of the brooch sale were to be retitled from accounts held as tenants by the entirety into accounts held solely in her name, under the Agreement the terms of the accounts never changed, *i.e.,* the proceeds of the accounts could only be used for their children's benefit.  We agree with the circuit court that given the terms of the accounts, this asset was properly not included as part of Ms. Niceta's assets under the Agreement.

**$7 million lump sum**.  Lastly, Mr. Lloyd argues that the circuit court erred in not including the $7 million lump sum payment (should he commit adultery or otherwise violate his commitments under the Agreement) as an asset of Ms. Niceta.  He does not dispute that payment of the lump sum was "not a given" at the time the Agreement was signed, but he suggests that because other conduct could trigger the payment (*e.g.*, sexting), the lump sum payment should have been viewed as an asset of Ms. Niceta in the circuit court's unconscionability analysis.  Mr. Lloyd offers no rationale for this argument and we see none.  We agree with the trial court that this amount should not be included as an asset of Ms. Niceta's at the time the Agreement was signed because the acts prohibited in the

20

lump sum provision were prospective in nature. Unconscionability is not determined on future facts but events that exist "at the time a contract is formed." *Li*, 210 Md. App. at 101.

In sum, the circuit court found that at the time the Agreement was executed, in the event of divorce Ms. Niceta was to receive the value of their Chevy Chase house, $2.25 million, and ½ of the second installment inheritance, $2.7 million, for a total of $4.95 million. Mr. Lloyd was to receive ½ of the second installment inheritance, $2.7 million, and be responsible for $56,540 annually, based on expenses related to the Chevy Chase property, Ms. Niceta's long term care policy, and five life insurance policies. When the Agreement was signed, Mr. Lloyd earned about $100,000 a year. The court also noted that at the time the parties signed the Agreement, he retained his ½ share of the first installment from his grandmother's inheritance, worth approximately $2.6 million. Under the circumstances, the court found that Mr. Lloyd would not be penniless as he claimed, nor did the distribution shock the court's conscience.[7,8] As we have noted, we find no abuse of discretion in the court's finding.

---

[7] Under the terms of the Agreement, any non-liquid assets Mr. Lloyd inherited during the marriage were to be titled solely in Mr. Lloyd's name and to remain titled in his name alone in the event of divorce. The court did not attribute this "asset" (basically Mr. Lloyd's future inheritance from his father) to Mr. Lloyd in its unconscionability analysis of the Agreement, presumably because it was unknown and prospective in nature, but the court did include Mr. Lloyd's future inheritance in its unconscionability analysis of the lump sum provision.

[8] The question naturally arises: when an appealing party asserts that the evidence below ought to have shocked the conscience of the trial court, must the appellate court be bound by the trial court's conscience (or lack thereof) or may we substitute our collective

(continued…)

21

Mr. Lloyd also argues that the Agreement was substantively unconscionable because the terms placed obligations on him that would have been impossible for him to perform at the time it was signed.  Because his obligations under the Agreement totaled $56,540 annually, and he earned approximately $100,000 a year at the time the Agreement was executed, he argues that his total obligations under the Agreement would have caused him to "be in debt as the result of the division of assets under the Agreement," and he "would be incapable of supporting himself[.]"  We agree with the circuit court.  We fail to see how he would have had insufficient income and assets to meet his annual $56,540 obligation to Ms. Niceta when he had $2.7 million in assets under the Agreement and earned $100,000 per year at the time the Agreement was executed.  Therefore, this argument is without merit.

### C. Was the Agreement procured by undue influence and/or unfair because the parties were in a confidential relationship?

Mr. Lloyd argues that the circuit court erred in not rescinding the Agreement because 1) it was procured by undue influence, and/or 2) was unfair because the parties

---

consciences for that of the trial court?  More concisely, whose conscience must be shocked, or not shocked?

Whether the context is substantive due process rights, damages award, or contract law, case law states that it is the "court's" conscience that must be shocked. *E.g., Lombardi v. Whitman*, 485 F.3d 73, 85 (2d Cir. 2007) (the burden of a shock the conscience analysis falls on the one who must make such a decision).  Does this mean our conscience must be shocked on appeal?  We have not found a Maryland case that provides the answer.  But, because we review for abuse of discretion, we must determine whether the circuit court abused its discretion in having a shocked conscience.  Which, one could conclude, we must consider our conscience as well.  Interestingly, Justice Scalia in his dissent in *Herrera v. Collins,* 506 U.S. 390, 428 (1993) questioned the "usefulness of 'conscience shocking' as a legal test[.]"

22

were in a confidential relationship at the time the Agreement was made. Mr. Lloyd argues that Ms. Niceta's domination of him resulted in undue influence and, because they were in a confidential relationship, the burden was on her to prove that the Agreement was fair in all respects. Lastly, he argues that the circuit court failed to make any factual findings regarding the presence or absence of either undue influence or a confidential relationship, even though the issue was fully litigated. Ms. Niceta responds that the circuit court did make specific findings of fact rejecting his argument that the Agreement was procured by undue influence or that the parties were in a confidential relationship when the Agreement was executed.

As a prerequisite to a finding of whether a contract was a product of undue influence (or duress), it must first be determined whether a confidential relationship existed between the parties. That is so because the burden of proof shifts depending on whether the parties were in a confidential relationship. *Blum v. Blum*, 59 Md. App. 584, 595 (1984). The party alleging undue influence (or duress) bears the burden of proof, unless the parties were in a confidential relationship; if so, the opposing party bears the burden of proof. *Cannon v. Cannon*, 384 Md. 537, 554-55 (2005).

In *Cannon*, the Court held that when reviewing the validity of a premarital agreement, "a confidential relationship is presumed to exist as a matter of law," but that presumption "may be rebutted . . . by the party seeking enforcement of the agreement. If the party seeking enforcement can prove that a negotiation took place between the parties— an actual give and take occurrence, then a court properly may treat the contested agreement as a contract between equals." *Id*. at 572. *See also Harbom v. Harbom*, 134 Md. App. 430,

23

441 (2000) (The inequality present in a confidential relationship "may be cured by the access to legal counsel by the party in the less advantageous bargaining position."). In *Hale*, we reviewed the validity of a separation agreement between a married couple and stated:

> "[T]he question of whether a confidential relationship exists between husband and wife [is] a question of fact. Among the various factors to be considered in determining whether a confidential relationship exists are the age, mental condition, education, business experience, state of health, and degree of dependence of the spouse in question." *Bell v. Bell*, 38 Md. App. 10, 14 (1977), *cert. denied,* 282 Md. 729 (1978). The trial court found that Mr. Hale was the dominant party in a confidential relationship with his wife. In reviewing [a trial court's decision regarding the existence of such a relationship], "we must first assume the truth of all the evidence and of all the favorable inferences fairly deducible therefrom tending to support the factual conclusions reached by the [trial judge]." *McClellan v. McClellan*, 52 Md. App. 525, 530 (1982), *cert. denied*, 295 Md. 283 (1983) (citations omitted).

*Hale*, 74 Md. App. at 564.

In *Hale*, we affirmed a trial court's legal determination that the parties were in a confidential relationship at the time they signed a separation agreement. There, Ms. Hale had one year of community college education and limited business experience, and prior to their separation, Ms. Hale "never even had her own bank account." *Id*. at 564-65. In addition, the trial court found that Ms. Hale "was not well physically at the time the agreement was promulgated" and was under great emotional stress when she learned of her husband's infidelity, and after their separation, she had difficulty eating and sleeping and developed an ulcer. *Id*. at 565. The trial court also concluded that Ms. Hale did not understand the separation agreement. *Id*. Against this factual backdrop, we agreed with the trial court that Ms. Hale, who had the burden of establishing a confidential relationship,

24

reasonably believed that Mr. Hale was acting in her best interests, and therefore, we held that a confidential relationship existed. *Id*. at 567.

At first glance *Cannon* (which neither party cited when discussing whether the parties were in a confidential relationship when they signed the Agreement) and *Hale* (which Ms. Niceta did cite) seem to have contrary holdings. Nonetheless, we think *Cannon* and *Hale* may be read congruently. *Cannon* occurred in the context of a premarital agreement while *Hale* occurred in the context of a separation agreement.[9] It is reasonable to assume that the parties to a premarital agreement are less likely to know of each other's financial resources and assets to the extent that a married couple might when negotiating a post-nuptial agreement. Hence, we apply the *Hale* standard to the circumstance now before us.

Although Maryland courts "have not created a bright-line test to detect the existence of undue influence," *Anderson v. Meadowcroft*, 339 Md. 218, 229 (1995), the Restatement (Second) of Contracts provides: "Undue influence is unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation between them is justified in assuming that that person will not act in a manner inconsistent with [her] welfare." Restatement (Second) of Contracts, § 177 (1981). Additionally, Williston on Contracts describes "undue influence" as follows:

> If a party in whom another reposes confidence misuses that confidence to gain an advantage while the other has been made to feel that the party in question will not act against its welfare, the transaction is the

___

[9] Indeed, in *Cannon,* Judge Harrell recalled that, in *Levy v. Sherman*, 185 Md. 63, 73-74 (1945), a confidential relationship existed as a matter of law between parties in contemplation of an antenuptial agreement where marriage was its consideration.

25

result of undue influence. The influence must be such that the victim acts in a way contrary to its own best interest and thus in a fashion in which it would not have operated but for the undue influence. Undue influence is equivalent to that which constrains the will or destroys the free agency of the person and substitutes in its place the will of another. The characteristics which play a role in establishing undue influence include pressure "of whatever sort which overpowers the will[.]" The pressure is applied "by a dominant subject to a servient object." The will of the servient person is actually the will of the dominant party.

28 Richard A. Lord, Williston on Contracts § 71:51 (4th ed. 2020) (footnotes omitted).

In his counterclaim, Mr. Lloyd argued that the Agreement was invalid because it was procured by duress and undue influence, and the parties were in a confidential relationship, which resulted in an unfair Agreement.[10] During closing argument, Mr.

---

[10] Duress, like undue influence, includes lack of free will as a central component. "In order to establish duress, there must be a wrongful act which deprives an individual of the exercise of his free will." *Eckstein v. Eckstein*, 38 Md. App. 506, 512 (1978). Quoting from *Central Bank v. Copeland*, 18 Md. 305, 317-18 (1862), we stated the rule as follows in *Eckstein*:

"The element of obligation upon which a contract may be enforced springs primarily from the unrestrained mutual assent of the contracting parties, and where the assent of one to a contract is constrained and involuntary, he will not be held obligated or bound by it. A contract, the execution of which is induced by fraud, is void, and a stronger character cannot reasonably be assigned to one, the execution of which is obtained by duress. Artifice and force differ only as modes of obtaining the assent of a contracting party, and a contract to which one assents through imposition or overpowering intimidation, will be declared void, on an appeal to either a court of law or equity to enforce it. The question, whether one executes a contract or deed with a mind and will sufficiently free to make the act binding, is often difficult to determine, but for that purpose a court of equity, unrestrained by the more technical rules which govern courts of law in that respect, will consider all the circumstances from which rational inferences may be drawn, and will refuse its aid against one who, although apparently acting voluntarily, yet, in fact, appears to have executed a contract, with a

(continued…)

Lloyd's counsel argued these concepts together, focusing on the alleged coercive control Ms. Niceta exercised over Mr. Lloyd.

The circuit court addressed Mr. Lloyd's confidential relationship and duress/undue influence claim, specifically stating in its ruling that it declined to accept the testimony and opinion of Dr. Robin Deutsch, Mr. Lloyd's expert in clinical and forensic psychology with a focus on intimate partner domestic violence and on families of separation and divorce. Dr. Deutsch hypothetically opined that it would be irrational for one to enter into an agreement like the one entered into by Mr. Lloyd, unless one was under the influence of a coercive, controlling partner. The court declined to accept Dr. Deutsch's opinion because it was based only on information provided by Mr. Lloyd and she had not spoken to or interviewed either of the parties. Additionally, although the circuit court found that Ms. Niceta had said "ugly" and "unfortunate" things in the emails and conversations with family and friends regarding her discovery of the first affair, the court did "not believe [that Ms. Niceta] kept [Mr. Lloyd] from his family or berated him to the point that he was coercively controlled into signing the [A]greement." The circuit court also found that Mr. Lloyd's act of engaging with his counsel in successfully negotiating changes to the Agreement "shows that he is an individual who was still exercising his free will."

Under the circumstances, the circuit court clearly did not find a confidential relationship between the parties when the Agreement was executed. Mr. Lloyd needed to

---

mind so subdued by harshness, cruelty, extreme distress, or apprehensions short of legal duress, as to overpower and control the will."

*Eckstein*, 38 Md. App. at 512-13.

27

show that his age, mental condition, education, business experience, state of health, and degree of dependence on Ms. Niceta resulted in his belief that he needed to rely upon her to act in his best interest.[11] Based on the facts presented and the court's findings, this he failed to do. Because the parties were not in a confidential relationship when they executed the Agreement, Mr. Lloyd bore the burden of proving that the Agreement was procured by duress/undue influence. *See Blum*, 59 Md. App. at 595. Again, we perceive no error by the circuit court in finding the facts insufficient to meet the requirements for a finding of duress/undue influence. To the contrary, the court's factual findings were that Mr. Lloyd did exercise free will in the negotiation of the Agreement, and Ms. Niceta's coercive behaviors were insufficient to show undue influence/duress. We find no error.

## II.

Mr. Lloyd next argues that the "lump sum" clause of the Agreement was void as contrary to public policy and unconscionable. We shall again address each argument in turn.

### A. Was the lump sum provision against public policy?

Mr. Lloyd argues that we should rescind the lump sum provision of the Agreement because it is against public policy for two reasons: 1) it is an illegal, punitive, liquidated damages provision, and 2) it is disproportionate to any damages that might have resulted from a breach. Ms. Niceta disagrees that the lump sum provision constitutes liquidated

---

[11] Application of the *Cannon* standard would not lead us to a different conclusion. The testimony elicited at trial showed ample evidence of extensive and thorough negotiations between adult, educated, sophisticated, business-oriented parties, who were represented by skilled and experienced counsel throughout.

28

damages because it was not intended to compensate her for damages she would sustain for breach of the Agreement. She concedes that the provision is a penalty but argues that Maryland does not ban penalties in marital contracts that are intended to discourage certain behaviors, like the one alleged here, that may damage the marital relationship.

"Liquidated damages" are defined as a "specific sum of money . . . expressly stipulated by the parties to a . . . contract as the amount of damages to be recovered by either party for a breach of the agreement by the other." *Traylor v. Grafton*, 273 Md. 649, 661 (1975) (quotation marks and citation omitted). Such a provision will be held to violate public policy and found not enforceable:

> "when it is intended to punish, or has the effect of punishing, a party for breaching the contract, or when there is a large disparity between the amount payable under the provision and the actual damages likely to be caused by a breach, so that it in effect seeks to coerce performance of the underlying agreement by penalizing non-performance and making a breach prohibitively and unreasonably costly."

*Barrie Sch. v. Patch*, 401 Md. 497, 510 (2007) (quoting 24 Richard A. Lord, Williston on Contracts § 65:1, at 216-23 (4th ed. 2002)).

The circuit court found *McGeehan*, 455 Md. 268, pertinent and persuasive to its reasoning regarding penalties in post-nuptial agreements, which are different in kind to classic contractual agreements. In *McGeehan*, the issue before the Court of Appeals was the validity of a post-nuptial agreement regarding various parcels of real property. The Court stated:

> "[S]imilar to an antenuptial agreement" is a postnuptial agreement that is "a contract—in this instance between a married couple—that sets forth the rights, duties and responsibilities of the parties during and upon

29

termination of the marriage through death or divorce." Cynthia Callahan & Thomas C. Ries, Fader's Maryland Family Law § 14-15. As such:

> Postnuptial agreements often look a lot like prenuptial agreements. In both contexts, couples are trying to assure that their financial situation is certain and predictable. . . . Alternatively, many postnuptial agreements attempt to use financial rewards and penalties to create incentives during a marriage that constrain the behavior of both spouses.

Sean Williams, *Postnuptial Agreements*, 2007 Wis. L. Rev. 827, 835 (2007). Williston has observed that "property settlements or other postnuptial agreements, whether in contemplation of divorce or otherwise, are generally held to be binding when they are shown to be fair and regular and not unconscionable or the product of fraud, duress, mistake or undue influence; and certainly when they have been fully executed they will be given effect." [5 Richard A. Lord,] Williston on Contracts § 11:7 (4th ed. [2009]).

*McGeehan*, 455 Md. at 297-98.

Mr. Lloyd argues that the circuit court erred in relying on *McGeehan* to uphold the lump sum penalty because there should be no exception to the prohibition against penalties in contracts. We are not persuaded. As the Court of Appeals clearly stated in *McGeehan*, post-nuptial agreements designed to discourage certain behavior are not void as a matter of public policy. The general public policy prohibition against penalties that coerce behavior in contracts does not apply with the same rigidity in the context of post-nuptial agreements. That is so as here, where public policy generally frowns on adultery, and post-nuptial agreements by their very nature may be viewed as penalizing because they may alter the financial agreement between the parties.

Mr. Lloyd also argues that the Agreement is against public policy because it was "'grossly excessive and out of all proportion to the damages that might reasonably have been expected to result from such breach of the contract[.]'" (Quoting *Traylor*, 273 Md.

at 662.) He argues that the language of the contract, which is so broad that it would "sweep up a substantial amount of innocent conduct" (*i.e.*, receiving a pornographic picture from another person); would impose a "massive financial penalty" that would leave him with "no assets" if he breached the provision; and would require him to stay married even if he was the victim of physical abuse because he could not have a secret credit card to consult a lawyer, was untenable and against public policy. The simple answer to this argument is that the Agreement in no way required Mr. Lloyd to stay married to Ms. Niceta. He could have ended the marriage at any time he chose by remaining separated for 12 months and filing for divorce.

### B. Was the lump sum provision unconscionable?

Mr. Lloyd argues that we should find the lump sum provision unenforceable because it is unconscionable. He argues that it was unconscionable because he could not pay the $7 million at the time the Agreement was entered into and because the provision created an environment of fear and coercion in the marriage. These claims address the substantive aspect of unconscionability.

The circuit court found that the lump sum provision was qualitatively different from the other assets transferred under the Agreement because Mr. Lloyd alone controlled whether it would come to pass. The court found that at the time of the Agreement, Mr. Lloyd retained about $5.4 million under the terms of the Agreement, adding in half of the first installment from his grandmother. The court questioned whether it was "unconscionable [for Mr. Lloyd] to agree to risk all of your net worth, plus another 1.5 million, that you would not commit adultery in the future?" Additionally, the court noted

31

that Mr. Lloyd expected to receive $12 million from his father. Under these circumstances, the court found that the "decision to agree to the $7 million penalty may have been improvident, but I do not believe it rises to the level of unconscionability." The court found that Mr. Lloyd "took on the risk that he would not receive the inheritance from his father's estate, and the risk that he would not commit adultery in the future." We agree with the circuit court's assessment. Because Mr. Lloyd alone controlled whether this provision was triggered, based on his assessment of his finances, we agree that this provision was not unconscionable.

He argues that the lump sum provision created an environment of fear and coercion in the marriage that was unconscionable. While such a provision might create fear, it could as well create stability and peace in a marriage because the consequences of various actions in a marriage are explicitly spelled out. Mr. Lloyd alone was the trigger of the penalty, and the circuit court found that he had acted with free will in the negotiation of the Agreement and thereafter. We agree with the trial court that the lump sum provision is not unconscionable.

### Ms. Niceta's Cross-claims

Ms. Niceta argues that the circuit court erred when it declined to order Mr. Lloyd to pay child support without first determining his actual income. She also argues that the circuit court erred when it failed to determine whether a trust provision prohibiting distributions to discharge Mr. Lloyd's legal obligations precluded the court from awarding child support that he practically could only pay from distributions to him from his deceased father's trust.

32

In its child support analysis, the circuit court ruled that the children benefitted financially from the financial distribution under the Agreement, particularly the provision giving the Chevy Chase home to Ms. Niceta and requiring Mr. Lloyd to pay for its upkeep, property taxes, and insurance until their youngest son reaches the age of 22. The court noted that Mr. Lloyd was also paying for the children's health insurance. The court stated that if the parties decide that the children will attend private school or should the children have "any extraordinary medical expense[s,]" those expenses shall be divided equally.

As the court, in rendering its oral opinion, began to address Ms. Niceta's child support argument, *i.e.*, that the court determine an amount of child support that could be applied against the spendthrift trust to which Mr. Lloyd is the beneficiary, the court was interrupted and never returned to this issue. The court did opine: "[G]iven all of those findings I'm making with regard to the financial benefits that the defendant is providing for the children, that it would not be appropriate to award any additional child support."

Likewise, the court did not consider and adhere to the child support guidelines in reaching its conclusion, as the statute requires. *See* Md. Code Ann., Family Law, § 12-202(a)(1) (stating that "in any proceeding to establish or modify child support … the court shall use the child support guidelines set forth in this subtitle"). Because child support was not fully briefed, argued, or decided by the trial court, we shall remand the child support issues raised in Ms. Niceta's cross-appeal to the circuit court for further appropriate hearing. *Cf. Ley v. Forman,* 144 Md. App. 658, 665-70 (2002) (remanding to the trial court to make specific findings of fact regarding parents' income as required by the child support

guidelines); *Tannehill v. Tannehill,* 88 Md. App. 4, 15 (1991) (remanding to the trial court

where it departed from child support guidelines but failed to make requisite findings).

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AS TO ISSUES RAISED BY APPELLANT AFFIRMED. MATTERS RELATING TO CHILD SUPPORT IN APPELLEE'S CROSS-APPEAL ARE REMANDED TO THE CIRCUIT FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID 2/3 BY APPELLANT AND 1/3 BY APPELLEE/CROSS-APPELLANT.**